## In re BAIR ISLAND MARINA & OFFICE CENTER, Debtor.

## Susan L. UECKER, Trustee, Plaintiff,

v.

## Thomas DAVIDSON, Defendant.

Bankruptcy No. 4–88–00769 WW2. Adv. No. 4–89–0388 AN.

United States Bankruptcy Court, N.D. California.

June 22, 1990.

Jeffrey C. Wurms, San Francisco, Cal., for plaintiff.

William H. Brownstein, Studio City, Cal., Theodore N. Nunes, Beverly Hills, Cal., for defendant.

RANDALL J. NEWSOME, Bankruptcy Judge.

This Chapter 7 adversary proceeding is before the Court pursuant to a trial on the merits of trustee Susan Uecker's Complaint for breach of contract, declaratory judgment, and sanctions for violation of the automatic stay. The Court has core jurisdiction over this matter pursuant to 28

U.S.C. § 157(b)(2)(A), (N) and (O). This action involves a $100,000 earnest money deposit which was placed into escrow by the defendant Thomas Davidson pursuant to a Court-approved sale of the debtor's only asset, Bair Island Marina & Office Center located in Redwood City, California. Through a series of events, Davidson ended up with a check for $100,000, and the trustee ended up with nothing.

The issues to be decided are first, whether the earnest money deposited into the escrow account pursuant to this Court's order of sale constituted property of the estate pursuant to 11 U.S.C. § 541; and second, the extent of the purchaser's liability, if any, for exercising control over and depriving the estate of that earnest money.

After thorough consideration of the testimony offered at trial on the merits on March 19, 1990 and April 10, 1989, this Court holds that the $100,000 earnest money deposit is property of the estate, that the Defendant committed a willful violation of the automatic stay, and that he is liable for actual damages of $100,000, the attorney fees expended in recovering the money, and punitive damages of $50,000.

## FINDINGS OF FACT

In August of 1986 Bair Island Marina and Office Center, a limited partnership ("Bair Island") purchased a 12–acre parcel of oceanfront property in Redwood City, California, from C.J. Development Co., a limited partnership which was a debtor in bankruptcy. Gary Castro and Timothy Jensen were the general partners of C.J. Development, and eventually became general partners of Bair Island. Included among the assets of the sale (which was approved by this Court), was the land plus two important entitlements needed to develop the property into a 122–slip marina and office complex. The first was a development permit from the Army Corps of Engineers. The second involved a specific condition of that permit, that being the completion of performance under a "mitigation agreement" with the Peninsula Open Space Trust ("POST"). Under that agreement, C.J. Development was required

to purchase privately-held acreage in environmentally-sensitive marshlands located in the southernmost portion of San Francisco Bay, and then transfer this property to POST in mitigation of the loss of open space resulting from the marina development. In accordance with this agreement, C.J. Development had deposited $188,500 in escrow to purchase the required land.

Centennial Mortgage Income Fund II ("Centennial") loaned Bair Island $3,487,-200 to make the purchase from C.J. Development, and took back a deed of trust on the marina property as well as a security interest in the permits, amounts on deposit, and any other intangibles. (Exhibits A & B attached to document 3, RS 88–0432.)

After the sale, Castro on behalf of Bair Island began negotiations with POST regarding the acquisition of the marshlands called for by the mitigation agreement. Thereafter, Castro apparently expended some of the trust money for the purchase of marshland acreage.

In the meantime, on February 19, 1988 Bair Island defaulted on the Centennial note, and filed its own Chapter 11 petition. On March 11, 1988 Centenial filed a motion for relief from the automatic stay to allow it to proceed with a foreclosure on its deed of trust. (RS 88–432).

On April 5, 1988 Centennial also filed a motion to appoint a Chapter 11 trustee. Among other things, Centennial asserted in this motion that Castro was refusing to turn over to Bair Island the marshlands it had purchased on its behalf, and was claiming that C.J. Development Co. held title to that property. A hearing was held on this motion on June 14, 1988. At that hearing attorney John Chu appeared representing Thomas Davidson, who expressed an interest in purchasing the marina site for $5 million. The Court held that the stay would be lifted effective 30 days hence and a trustee would be appointed to investigate and pursue causes of action against Bair Island's principals unless a binding sale agreement was executed in the interim. Castro, Jensen and Davidson reached such an agreement on July 22, 1988. That agreement, which was drafted by Davidson

but not presented to the Court, called for a $5 million purchase price, and a $100,000 earnest money deposit, which had already been paid into an escrow account opened at Stewart Title of California in San Jose. Davidson could withdraw this money from escrow at any time within 180 days if he was not satisfied that all of the appropriate permits and reports had been obtained. If notice of his dissatisfaction was not given within this 180 day period, then "the conditions shall be deemed satisfied and earnest money shall remain deposited with escrow holder and applied under this agreement ...", i.e. applied to the purchase price or paid to the seller as liquidated damages. The sale was to close no later than May 1, 1989. Plaintiff's Exhibit 1.

A separate letter agreement drafted by Centennial's counsel, which was ultimately signed by all parties and acknowledged in open court on July 22, was largely consistent with Davidson's draft. Among other things, it called for Davidson to deposit $100,000 in earnest money with the Court, and included an acknowledgment by Castro, Jensen, C.J. Development Co. and Bair Island that the Army Corps of Engineers' permit and the mitigation agreement were "property of the Debtor and are subject to the Security Agreement held by Centennial." Certain other points were agreed to in principle but required "fine tuning." For purposes of this dispute, the most important of these is as follows:

> (e) Unless the escrow has been previously cancelled, on February 1, 1989 the $100,000 deposit will be automatically and irrevocably released to Centennial
> ...

Plaintiff's Ex. 2.

After all of the parties had signed off on the agreement, the Court ordered the sale to be consummated according to its terms, and emphasized that the essential terms of the agreement were binding and immutable at that point regardless of any additional language which might be added. (Transcript of proceedings, July 22, 1988).

Shortly after the July 22, 1988 hearing, a set of escrow instructions and a purchase agreement were drawn up by Davidson which fleshed out the parties' arrangement. Plaintiff's Ex. 4. Those documents make it clear that the seller would receive $300,000 (Paras. 1.1 & 1.2); that buyer was to obtain the needed permits and reports by February 1, 1989; that escrow was to close on that date, but that extensions of the closing date could be purchased for $45,000 each, to extend that date to May 1, 1989 at the latest (Para. 6.4); and that up to February 1, 1989 Davidson could at his option withdraw from the sale and obtain a refund of his $100,000, but that after that date the money was to be applied to the purchase price if escrow closed, or be forfeited if it did not. (Paras. 2.0, 4.0, and 6.3).

While Davidson and Centennial signed off on these documents, Jensen and Castro refused to do so. Notwithstanding express provisions to the contrary in the July 22, 1988 agreement and order, Jensen claimed that the mitigation agreement and the property purchased pursuant thereto belonged to C.J. Development, not Bair Island, and also claimed an entitlement to all or a portion of the money held in escrow for POST. On February 1, 1989 Davidson moved for appointment of a Chapter 11 trustee. That motion was granted at a hearing held on March 16, 1989, and an order was entered on March 22, 1989. That same day, Centennial, counsel for trustee Susan Uecker, and Davidson entered into a supplemental agreement. Plaintiff's Ex. 5. Centennial agreed to extend a March 24, 1989 foreclosure date to March 31, 1989. The trustee and Davidson agreed to execute and deliver to Centennial by 5:00 p.m. on March 30, 1989 a copy of the escrow instructions. Davidson agreed to deliver a check for $190,000 to Centennial by 5:00 p.m. on March 30. While the agreement references paragraphs 6.3 and 6.3.1 of the escrow instructions, all of the documents and the testimony of all of the witnesses leads this Court to conclude that $100,000 of this sum represented the nonrefundable earnest money which was to be applied to the purchase price, while the $90,000 was intended as a nonrefundable purchase of two 45–day extensions of the February 1, 1989 closing date. If both of

these conditions were met, the closing would be extended to May 1, 1989.

Uecker did in fact execute the escrow instructions, but noted that as between the buyer and seller they would be modified on or before March 30, 1989. According to her testimony the sole change she believed was necessary consisted of eliminating the provisions authorizing Davidson or anyone else to act in her behalf in the sale.

As for the $190,000, Uecker and Davidson agreed that Davidson would attempt to raise an additional $90,000 from his investors, and that Uecker thereafter would instruct Stewart Title to issue a check to Centennial for $100,000. That check along with the signed escrow instructions were to be sent to Davidson in Los Angeles. Davidson would then hand-deliver the $190,000 and the escrow instructions to Centennial before the deadline.

Between March 24 and March 30 the trustee and her counsel were in frequent contact with Davidson regarding the additional $90,000. Both testified that Davidson did not express a willingness to come up with the money until the morning of March 30. The trustee promptly arranged for the delivery of the escrow instructions and the $100,000 check by air cargo to Davidson. The flight did not arrive until just before 5:00 P.M. Davidson testified that he did not receive the package from the airline parcel office until 5:12 P.M. Davidson made no attempt to tender the check to Centennial or its attorney that evening nor the following morning nor at any time thereafter. Instead, he simply pocketed the check and the $90,000 and turned it over to Sidney Lampert, the investor who had originally put up the money. Notwithstanding that the check was made out to Centennial, the investor managed to recover the $100,000 held in escrow by means that remain unclear. In the meantime, on March 31, 1989 Centennial foreclosed on Bair Island.[1] On April 3, 1989 the trustee made demand upon Davidson to turn over the check, but he refused.

Not only did Davidson and his investors ultimately get their $100,000 deposit back, they also got Bair Island. The property is now being developed by Redwood Marina Enterprises, Inc., the president of which is none other than Sidney Lampert. Not surprisingly, Davidson is employed by Redwood Marina Enterprises as the project manager.

In November of 1989 Centennial and the trustee entered into a compromise whereby the parties would evenly split the net proceeds after legal costs, if any, that the trustee obtains from Davidson. While a notice of compromise was sent to creditors and no objections were filed, counsel for the trustee has yet to submit an order approving the compromise.

### Opinion and Conclusions of Law

A review of both the Bair Island case file and of the evidence presented at the trial of this adversary proceeding leaves the distinct impression that Davidson, Centennial, and Jensen were operating pursuant to agendas to which neither the trustee nor this Court were privy, and that each of those agendas was satisfied to the exclusion of the estate. As was disclosed for the first time in defendant's post-trial brief, apparently even Jensen got some of what he wanted. Subsequent to Centennial's foreclosure he apparently assigned his or C.J. Development's "rights" to the mitigation agreements to Centennial in exchange for an undisclosed sum of cash.

■ While much of the parties' dealings remain murky, the determinative facts are beyond dispute. Davidson's right to withdraw the $100,000 earnest money terminated on February 1, 1989. Both of the July 22, 1988 agreements, as well as the escrow instructions, are absolutely clear on this point, and nothing in the March 22, 1989 letter agreement (or for that matter, any other document) even mentions this deadline, let alone extends it. Thus, once the February 1, 1989 deadline expired, Davidson had no right to withdraw the $100,000 from the escrow account. As of February 1, 1989 that money became property of the estate notwithstanding any rights Centen-

---

1. The Chapter 11 case was converted to a Chapter 7 by order entered July 19, 1989.

nial may have had to it. *In re Contractors Equipment Supply Co.*, 861 F.2d 241, 244 (9th Cir.1988). Given the fact that the debtor stood to receive $300,000 from the sale, as well as the acknowledgments in the agreements that the property involved was property of the debtor, under 11 U.S.C. § 541 the debtor held both a legal and equitable interest in the earnest money, both before and after February 1, 1989. This is true notwithstanding any rights which Centennial may have had to the money. *In re Contractors Equipment Supply Co.*, 861 F.2d 241, 244 (9th Cir.1988).

██ While this finding makes it irrelevant whose fault it was that the sale could not be consummated, Davidson's arguments in this regard require some refutation. He seems to suggest that during the nine days which transpired after her appointment and before March 30, 1989, the trustee had an obligation to enlist this Court's assistance in requiring Jensen to turn over the mitigation properties and permits. The fact is, however, that it was the *buyer's* obligation under the agreements to obtain what was needed to close the sale and develop the site. If the buyer was not satisfied that all of the conditions were met, his remedy was to withdraw the earnest money, *so long as he did so prior to February 1, 1989.* After that date, his only remedy was to obtain extensions of the closing date. Davidson's motion to appoint a trustee makes it obvious that his troubles with Jensen began not long after July 22, 1988, and continued thereafter unabated. If anyone was dilatory in pursuing legal action against Jensen, it was Davidson.

Far from supporting Davidson's other accusations regarding the trustee's conduct between March 21 and March 30, 1989, the evidence suggests that Davidson's own dilatory conduct, particularly his delay in committing to pay an additional $90,000, was designed to scuttle the sale.

██ Having found that the $100,000 earnest money was property of the estate, it follows that Davidson was stayed from doing anything to obtain that money or exercising control over it pursuant to 11 U.S.C. § 362(a)(3), and that his conduct constituted a violation of the stay. The Court also has no difficulty in finding that Davidson's violation of the stay was sufficiently willful to trigger the remedies set forth in 11 U.S.C. § 362(h)[2]. Obviously, Davidson knew of the debtor's bankruptcy petition, and was specifically informed by the trustee that his conversion of the check was in violation of the automatic stay. Regardless of his belief that the estate had no right to the money, his conduct was certainly willful as that term has been defined in the caselaw of the Ninth Circuit. *In re Taylor*, 884 F.2d 478, 483 (9th Cir.1989); *In re Bloom*, 875 F.2d 224, 227 (9th Cir.1989). Accordingly, the trustee is hereby awarded actual damages of $100,000, plus reasonable attorney fees to be determined upon application and subsequent hearing.

██ The Court further finds that Davidson's conduct was egregious enough to warrant the imposition of punitive damages. The evidence presented leads inescapably to the conclusion that at some point, Davidson and his investors determined that Bair Island might be acquired for less money if the deal with the trustee were allowed to fall apart. Regardless of what Jensen ultimately extracted from them, by cutting out the trustee they would save the $300,000 which the estate was to receive from the sale proceeds. By converting the $100,000, Davidson was able to rekindle negotiations with Jensen and Centennial as though the July 22, 1988 agreements and order never existed, the exact result which the $100,000 deposit was intended to avert. To allow the bankruptcy court's supervisory authority over sales of estate property to be flouted in such a fashion would reduce bankruptcy sales to the lowest level of gamesmanship in the lowest form of a back alley marketplace. As a means of

---

**2.** Consistent with the caselaw interpreting this statute, the Court reads "individual" in § 362(h) as meaning "entity" as defined in 11 U.S.C. § 101(14). *Budget Service Co. v. Better Homes of Virginia*, 804 F.2d 289, 292 (4th Cir.1986); *In re Tel–A–Communications Consultants, Inc.* 50 B.R. 250 (Bankr.D.Conn.1985).

both punishing and deterring this sort of callous, calculating conduct, the Court hereby awards punitive damages to the plaintiff in the amount of $50,000. *See In re Bloom*, 875 F.2d 224, 227 (9th Cir.1989); *In re Sansone*, 99 B.R. 981, 989 (Bankr.C.D.Cal.1989). Pursuant to 28 U.S.C. § 1961 interest at the rate of 9.43% [3] shall accrue on both compensatory and punitive damages from March 30, 1989 forward.

The foregoing shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

### JUDGMENT ENTRY

For the reasons stated in the Findings of Fact, Opinion and Conclusions of Law entered contemporaneously herewith, judgment is hereby rendered in favor of the plaintiff, Susan Uecker, Trustee, in the amount of $100,000 in compensatory damages, $50,000 in punitive damages, and attorneys' fees in an amount to be determined in a subsequent proceeding.

IT IS SO ORDERED.

---

**3.** This rate constituted the average price accepted for Treasury bills auctioned on March 9, 1989. *See, In re Bloom*, 875 F.2d 224, 228 (9th Cir.1989).