In the Matter of GAROFALO'S FINER FOODS, INC., Debtor.

Philip V. MARTINO, as Trustee, Plaintiff/Appellee and Cross–Appellant,

v.

FIRST NATIONAL BANK OF HARVEY, Defendant/Appellant and Cross–Appellee.

Bankruptcy No. 90 B 8112.
No. 94 C 1157.
No. 92 A 108.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 18, 1995.

**418**

Richard W. Burke, Gerard Dennis Ring, Burke, Warren & MacKay, Chicago, IL, Earle S. Rappaport, Jr., Richard T. Reibman, Paul Joseph Gaynor, Schwartz, Cooper, Greenberger & Krauss, Chicago, IL, for First National Bank of Harvey.

Faye B. Feinstein, Keith Adam Goldberg, John McGinnis, Altheimer & Gray, Chicago, IL, for Philip V. Martino.

Philip V. Martino, Trustee, Rudnick & Wolfe, Chicago, IL.

## MEMORANDUM OPINION AND ORDER

COAR, District Judge.

The defendant/appellant/cross-appellee First National Bank of Harvey ("FNB–Harvey") has appealed the February 17, 1994 decision of the bankruptcy court wherein that court concluded that FNB–Harvey violated 11 U.S.C. sections 364(b), (c) and (d) by extending post-petition overdraft credits to debtor Garofalo's Finer Foods, Inc. ("Garofalo's") outside of the ordinary course of business as contemplated in 11 U.S.C. section 364(a). The bankruptcy court further concluded that FNB–Harvey violated the terms of certain cash collateral orders. The court therefore entered judgment in favor of plaintiff/appellee/cross-appellant Trustee Philip V. Martino ("Trustee") and against FNB–Harvey in the amount of $2,315,901.22, plus costs. FNB–Harvey appeals this judgment, and the Trustee has filed a cross-appeal of the bankruptcy court's denial of his motion for attorney's fees.

This court has jurisdiction pursuant to 28 U.S.C. section 151(a).

### I. Facts

On May 2, 1990, the debtor Garofalo's Finer Foods, Inc. filed a voluntary chapter 11 petition. On and prior to May 2, 1990, Garofalo's obtained much of the inventory and equipment it needed to operate its two neighborhood grocery stores from Scot Lad Foods, Inc. and the Midland Grocery Company (collectively, the "Suppliers"). Scot Lad Foods also leased the two store properties to Garofalo's. Scot Lad Foods and Midland Grocery Company are both subsidiaries of Roundy's, Inc.

As of the petition date, Garofalo's was indebted to its secured creditors in excess of $1.7 million: it owed approximately $1.3 million to the Suppliers; $400,000 to Beverly Bank Matteson ("Beverly Bank"); and $10,000 to FNB–Harvey on an automobile installment loan. Garofalo's was further indebted to FNB–Harvey on an unsecured note in the amount of $102,000, and owed its other unsecured creditors an additional $1.4 million. Garofalo's obligations to the Suppliers were secured by its then owned and thereafter acquired inventory, supplies, cash, accounts, accounts receivable, furniture fixtures, equipment, and proceeds thereof (the "collateral"); this collateral also secured its obligation to Beverly Bank, a junior lienholder.

On and prior to May 2, 1990, Garofalo's had a long standing banking relationship with FNB–Harvey, where it maintained its principal checking account. In the seventeen (17) months preceding its bankruptcy petition, Garofalo's overdrew its checking ac-

count fifty (50) different times. On each of those occasions, FNB–Harvey extended overdraft protection to Garofalo's and honored the otherwise insufficiently funded checks. The amount of overdraft credit extended varied from a low of $431.93 to a high of $58,384.01; the aggregate amount of overdraft credit extended during this time period totalled $780,070.21. Garofalo's customarily repaid the credit within one or two days after it was extended.

After filing its bankruptcy petition, Garofalo's operated its business as a debtor-in-possession pursuant to 11 U.S.C. sections 1107 and 1108. To do so, Garofalo's negotiated and the court entered two series of "cash collateral orders" which authorized Garofalo's to use its creditors' cash collateral on a limited basis, subject to strict controls and operating budgets submitted to the court. The cash collateral orders provided adequate protection for the Suppliers and Beverly Bank in connection with Garofalo's use of their cash collateral by, *inter alia,* granting them continuing priority liens and security interests in and to all of Garofalo's post-petition assets, whether then existing or thereafter acquired (including proceeds, products and assessions thereof), to the same extent and priority as their pre-petition liens and security interests.

The bankruptcy court entered the final cash collateral order on November 13, 1990, and thereby authorized Garofalo's use of the cash collateral through either the confirmation or rejection of its amended plan of reorganization. Like the prior orders, the November 13, 1990 cash collateral order ratified and approved the terms of the loan documents that granted the Suppliers and Beverly Bank first priority liens and security interests in the collateral. In addition, the order provided that the Suppliers and Beverly Bank's pre-petition security interests created valid, perfected liens and security interests in and to Garofalo's pre-petition assets, not subject to any defenses. The order also granted the Suppliers an administrative expense priority claim under section 364(c)(1), with priority over all costs and expenses of administration, including those arising under chapter 7 of the Bankruptcy Code.

In further conformity with the prior orders, the November 13, 1990 order stated that its provisions would survive any order of confirmation or conversion and that the liens and security interests held by the Suppliers and Beverly Bank would maintain their priority until their claims were satisfied. Finally, the order stated that it "shall be binding upon ... the other parties in interest in this Proceeding....", which included FNB–Harvey. The bankruptcy court found that FNB–Harvey had actual notice and knowledge of the bankruptcy proceedings, and that counsel for FNB–Harvey was involved to a limited extent in the hearings that led to the entry of the cash collateral orders.

FNB–Harvey continued to honor Garofalo's overdrawn checks during the time period governed by the cash collateral orders. Garofalo's used the overdraft credit to pay its ordinary operating expenses. FNB–Harvey used funds subsequently deposited by Garofalo's into its checking account to repay the extended overdraft credit. For example, if on Monday, Garofalo's had a $1,000 balance in its checking account at FNB–Harvey and a check drawn on that account was presented at the bank in the amount of $1,900, FNB–Harvey would honor the check by covering the $900 difference with its own funds. Garofalo's would thus be indebted to FNB–Harvey in the amount of $900. If, on the following Tuesday morning, Garofalo's deposited $2,000 into its checking account, FNB–Harvey would apply $900 of the deposited funds to repay the overdraft debt and would credit the remaining $1,100 to Garofalo's checking account balance. Assuming no other transactions, Garofalo's account balance at the close of business on Tuesday would total $1,100.

Despite the strict controls and operating budgets required by the cash collateral orders, neither Garofalo's nor FNB–Harvey disclosed the overdraft credits to the bankruptcy court during the hearings preceding the entry of any of the cash collateral orders. Consequently, the cash collateral orders did not address Garofalo's acceptance of overdraft credit, its repayment of the credit or the impact of the credit on other creditors' claims.

On November 5, 1990, Garofalo's filed its plan of reorganization and disclosure statement. It failed, however, to file its required monthly operating reports with the United States Trustee's Office until the eve of the plan's confirmation. Garofalo's bookkeeper, Greg Joseph ("Joseph"), was responsible for filing these monthly reports. Joseph was actually employed by Roundy's, the parent corporation of the Suppliers, and had been appointed Garofalo's bookkeeper prior to May 1990 at Roundy's behest. As bookkeeper, Joseph prepared and kept Garofalo's books and records; prepared the projections that Garofalo's and the Suppliers presented in support of their agreed motions for issuance of cash collateral orders; and prepared the disclosure statements which were distributed to all creditors. However, Joseph did not disclose the overdraft credits to his employer or the Suppliers.

The monthly operating reports filed on the eve of confirmation revealed that Garofalo's checking account often had a negative ending monthly balance, but did not affirmatively disclose the overdraft credits extended by the bank. Garofalo's Second Amended Plan of Reorganization was confirmed by consent on March 4, 1991. During the intervening five month period, FNB–Harvey continued to extend overdraft credits to Garofalo's and honor its insufficiently funded checks. The bankruptcy court, however, was not apprised of the overdraft credits or repayment process prior to confirming the plan of reorganization.

In April 1991, approximately five weeks after confirmation, Garofalo's filed a motion to vacate the confirmation order because it was unable to meet its projections and could not make the proposed plan payments. The bankruptcy court denied the motion to vacate and converted the case into a Chapter 7 proceeding on April 11, 1991. The United States Trustee subsequently appointed Martino as Chapter 7 Trustee.

At the court's request, the Trustee conducted an investigation to determine why Garofalo's sought to vacate the reorganization order so soon after the reorganization plan had been confirmed. The bankruptcy court further instructed the Trustee to determine whether any improprieties, including criminal misconduct, were involved.

The Trustee's investigation revealed that FNB–Harvey had extended post-petition overdraft credits to Garofalo's until March 12, 1991, when it abruptly ceased doing so. Garofalo's bank records specifically revealed that FNB–Harvey had extended it overdraft credits on ninety-four (94) different occasions between May 2, 1990, and March 12, 1991. While the amount of the overdraft credits varied on a per occurrence basis, the size of the credits generally increased over time. By September 1990, Garofalo's had overdrawn its account on twelve (12) occasions. Beginning in mid-October 1990, Garofalo's was unable to deposit sufficient funds to "cover" the overdraft credits within two banking days, as had been its pre-petition practice. Between January 31, 1991, and February 12, 1991, FNB–Harvey extended overdraft credits in excess of $100,000 on three separate occasions, and the account was overdrawn with a daily credit balance often in excess of $200,000. FNB–Harvey nonetheless continued to honor Garofalo's overdrawn checks, even though Garofalo's account had become "one of the Bank's largest credit problems and a topic of daily discussion at the Bank." 164 B.R. at 964. By the end of business on March 12, 1991, Garofalo's outstanding balance for unrepaid credit totalled $99,291.34 (after the account was credited earlier that day with a repayment of $105,131.78 from deposited funds). Although FNB–Harvey ceased extending overdraft protection on March 12, 1991, it continued thereafter to use Garofalo's deposits to reduce the outstanding overdraft credit balance. In total, FNB–Harvey extended Garofalo's $2,340,997.40 in post-petition overdraft credits between May 2, 1990, and March 12, 1991. FNB–Harvey recovered $2,315,901.22 of this amount by crediting Garofalo's post-petition deposits, leaving an unpaid balance of $25,096.18. FNB–Harvey also charged Garofalo's a small service fee for each overdraft credit extended.

Based upon the results of his investigation, the Trustee and the Suppliers filed a six count adversary complaint against FNB–Harvey on February 5, 1992, to recover the

$2.3 million in Garofalo's deposits which the bank had used to repay the overdraft credits. Counts I through III sought to avoid these transfers pursuant to sections 364(b), (c) and (d) of the Bankruptcy Code; Count IV sought redress for FNB–Harvey's alleged violation of the cash collateral orders; and Count V sought relief for FNB–Harvey's alleged violation of the automatic stay order pursuant to sections 362(a)(3) and 362(a)(4). The Trustee voluntarily dismissed Count VI. The court later dismissed the Suppliers as a party plaintiff for lack of standing, but permitted the Trustee to retain the Suppliers' attorney as "special counsel" to the Trustee.

On June 11, 1992, the Trustee orally reported the results of his investigation to Judge Squires in open court. Counsel for FNB–Harvey was not present at the hearing. At that time, counsel for the Suppliers informed the court that:

> [i]f there was a single precipitating factor why the case converted is because the debtor was overdrawn at the Bank of Harvey and the Bank of Harvey ceased honoring overdrawn checks. And that was what converted the case. Because the debtor no longer then had the wherewithal to cover the overdrawn checks.

In short, once FNB–Harvey refused to extend any additional overdraft credit, Garofalo was unable to satisfy its obligations under the reorganization plan. The Trustee further advised the court that there was no evidence of criminal wrongdoing by any party.

After a four day trial, the bankruptcy court concluded that the overdraft protection provided by FNB–Harvey was not extended pursuant to the notice and hearing requirements of section 364(b), (c) and (d) and was not otherwise provided in "the ordinary course of business" within the requirement of section 364(a). Accordingly, the bankruptcy court concluded, *inter alia*, that the extension of overdraft credit by FNB–Harvey violated 11 U.S.C. sections 364(b), (c) and (d) and the cash collateral orders.

### II. Standard of Review

This court reviews the bankruptcy court's conclusions of law *de novo*. *See In re C & S Grain Co., Inc.*, 47 F.3d 233, 236 (7th Cir.1995); *In re Love*, 957 F.2d 1350, 1354 (7th Cir.1992), but reviews its findings of facts for clear error. *See Fed.R.Civ.P.* 52(a); *Bankr.R. 8013; In re Yonikus*, 974 F.2d 901, 903 (7th Cir.1992) (*citing In re Love*, 957 F.2d at 1354). A finding of fact is " 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citation omitted). Under this standard, the court is required to give great deference to the trier of fact's (*i.e.*, bankruptcy court's) findings. *In re Love*, 957 F.2d at 1354. As such, "if the trial court's account of the evidence is plausible in light of the record viewed in its entirety, a reviewing court may not reverse even if convinced that it would have weighted the evidence differently as a trier of fact." *Id.* "Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511.

The Trustee and FNB–Harvey initially disagree as to whether the bankruptcy court's conclusion that the overdraft credits were not extended within the "ordinary course of business" is a question of law or of fact. In actuality, the determination of whether certain transactions are within the "ordinary course of business" involves questions of both law and fact. The standards created to define and interpret the phrase "ordinary course of business" involve questions of law that are subject to *de novo* review: at the same time, the bankruptcy court's findings of fact and its ultimate determination whether a transaction was within the "ordinary course of business" (*i.e.*, application of the legal standard to the facts) are questions of fact subject to review under the clearly erroneous standard.

The varying standards of review result from the Bankruptcy Code's failure to define the phrase "ordinary course of business." Section 364(a) of the Bankruptcy Code provides:

If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1304, 1203 or 1204 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the *ordinary course of business* allowable under section 503(b)(1) of this title as an administrative expense.[1]

11 U.S.C. § 364(a) (emphasis added). The phrase "ordinary course of business" appears in other sections of the Code provisions, yet neither the Code nor its legislative history defines the phrase. *See Burlington Northern R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 704 & n. 45 (9th Cir.1988); *Armstrong World Indus. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 394 (S.D.N.Y. 1983). As discussed in section III *infra*, the courts have inherited the task of defining the "ordinary course of business." To complete this task—which, at its core, is a question of statutory interpretation—the courts have established legal standards to interpret and define this statutory phrase. The legal standards used by the bankruptcy court to define the phrase "ordinary course of business" are subject to *de novo* review. *See, e.g., In re Love*, 957 F.2d at 1354 (bankruptcy court's determination of the legal standards applicable to a "good faith" determination for a chapter 13 petition was subject to *de novo* review).

At the same time, the bankruptcy court's findings of fact with respect to what transpired (*e.g.*, when the overdraft credits were extended, what were the amounts of overdraft credit extended, which parties had knowledge of the overdraft credits, *etc.*) and, assuming that the court applied the proper legal standards, its conclusion that the overdraft credits were not within the "ordinary course of business" are subject to review for clear error. *See Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1269 (7th Cir.1991) ("[i]f the trial judge correctly states the law, then his findings as to whether the facts meet the

legal standard will be disturbed only if they are clearly erroneous") (*citing Pullman–Standard v. Swint*, 456 U.S. 273, 288, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982)); *In re Martin*, 761 F.2d 472, 475 (8th Cir.1985) (applying this standard to determine whether the bankruptcy court's finding of adequate protection pursuant to 11 U.S.C. section 361(3) was clearly erroneous); *see also Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 872 F.2d 739, 743 (6th Cir. 1989) (whether a pre-petition transfer was within the "ordinary course of business" pursuant to section 547(c)(2) was a "peculiarly factual analysis"); *Goger v. Cudahy Foods Co. (In re Standard Food Serv., Inc.)*, 723 F.2d 820, 822 n. 2 (11th Cir.1984) (whether a pre-petition transfer was in "the ordinary course of business" under section 547(c)(2) was a question of fact); *In re Love*, 957 F.2d at 1354 (bankruptcy court's determination that good faith existed for chapter 13 petition was a question of fact).

If, however, "the bankruptcy court's fact finding arises from a misunderstanding of the law, it is reviewed for plain error of law." *In re Fulghum Constr.*, 872 F.2d at 742; *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984) ("[r]ule 52(a) does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law"); *Daniels*, 937 F.2d at 1269–70 (appellate court review of fact findings is more searching if the district court has made an error of law which affects a finding of fact); *In re Dant & Russell, Inc.*, 853 F.2d at 705 (where the court, after articulating and applying the correct legal standards for defining "ordinary course of business," held that the bankruptcy court's conclusion that certain post-petition lease renewals were not within the ordinary course of business was "erroneous and cannot be upheld").

1. Under section 1107, a debtor-in-possession has all of the rights, functions and duties possessed by a trustee. *See 11 U.S.C. § 1107*. Under section 1108, a trustee is allowed to operate the debtor's business. *Id. § 1108*. Accordingly, a debtor-in-possession operating under the authority of sections 1107 and 1108 has the authority under section 364(a) to obtain unsecured credit in the ordinary course of business. *See Habinger, Inc. v. Metropolitan Cosmetic & Reconstructive Surgical Clinic, P.A.*, 124 B.R. 784, 785 (D.Minn. 1990).

### III. Ordinary Course of Business

The pivotal question is whether the post-petition overdraft credit was extended in the ordinary course of business between FNB–Harvey and Garofalo's. Resolving this question will determine the nature and priority of FNB–Harvey's claim(s) to the bankruptcy estate's post-petition assets for the overdraft credit it extended.

If the overdraft credit was extended within the ordinary course of business, prior court approval was not required and, equally important, the credit would be considered an administrative expense allowable under section 503(b)(1) of the Bankruptcy Code. *See 11 U.S.C. § 364(a)*. FNB–Harvey's administrative expense claim under section 503(b)(1) would come after the Suppliers' priority administrative claim under section 364(c)(1) (*see* November 13, 1990 cash collateral order), the remaining secured creditors' claims, and the chapter 7 administrative expenses, but would have priority over the unsecured creditors' claims. *See 11 U.S.C. § 507(a); Sapir v. C.P.Q. Colorchrome Corp. (In re Photo Promotion Assoc., Inc.), 881 F.2d 6, 10 (2d Cir. 1989); 2 Collier on Bankruptcy* ¶ 364.02 at 364–6 (L. King 15th ed. 1986). If, however, the overdraft credit was not extended within the ordinary course of business, it would only be considered an administrative expense allowable under section 503(b)(1) if the bankruptcy court, after notice and a hearing, authorized each extension of credit. *See 11 U.S.C. §§ 364(b)*. Finally, if the overdraft credit was not extended within the ordinary course of business and the bankruptcy court did not otherwise authorize its issuance, the unsecured overdraft credit would be treated as an unsecured claim. *See In re Massetti,* 95 B.R. 360, 362–63 (Bankr.E.D.Pa.1989); *In re John Deskins Pic Pac, Inc.,* 59 B.R. 809, 812 (Bankr.W.D.Va.1986); *2 Collier on Bankruptcy* ¶ 364.02 at 364–8 (L. King 15th ed. 1986).

At trial, FNB–Harvey argued that the overdraft credits were within the ordinary course of business because it had extended overdraft protection to Garofalo's both pre- and post-petition.[2] The Trustee countered that the amount and frequency of overdraft credits and the daily balance of unrepaid credit were so dramatically disproportionate post-petition as compared to pre-petition that the post-petition overdraft credits were not made within the ordinary course of business. The Trustee therefore argued that FNB–Harvey should have sought court approval of the overdraft credit pursuant to Code subsections 364(b), (c) or (d). The bankruptcy court, using a two-pronged vertical and horizontal dimensions test to define the "ordinary course of business," agreed with the Trustee and concluded that the post-petition overdraft credits were not extended within the ordinary course of business.

On appeal, FNB–Harvey presents three arguments on this issue: first, the bankruptcy court erred by concluding that all of the post-petition overdraft credits were not made within the ordinary course of business without first determining the point at which the post-petition overdrafts were inconsistent with or disproportionate to the pre-petition overdraft activity; second, the overdraft credits were authorized under section 364(b); and third, even if the post-petition overdraft credits were not extended in the ordinary course of business or otherwise authorized by the court, the bankruptcy court should have retroactively authorized the credits based upon the equities of this case.

### A. Defining the Ordinary Course of Business

■ As previously noted, the Bankruptcy Code does not define the "ordinary course of

2. Garofalo's previously filed for bankruptcy in 1968 under Chapter XI of the Bankruptcy Act then in effect. In 1968, as in 1990, Garofalo's maintained its checking account at FNB–Harvey. The record does not reveal the circumstances of the 1968 bankruptcy, except that FNB–Harvey's Chairman of the Board testified that Garofalo's had overdrawn its account during the pendency of those bankruptcy proceedings but had subsequently repaid the overdraft. (Tr., at 158). If FNB–Harvey extended post-petition overdraft credit to Garofalo's in 1968 prior to Garofalo's emergence from bankruptcy protection, an argument could be advanced that FNB–Harvey's practice of extending post-petition overdraft credit to Garofalo's in 1990 and 1991 was within the "ordinary course of business" between these two entities. FNB–Harvey did not present this argument to the bankruptcy court, and it thus does not factor in the court's decision.

business." In the absence of a statutory definition, the bankruptcy court adopted a two-prong test created and used by other bankruptcy courts to define this phrase. 164 B.R. at 962 (citations omitted). The first prong of this test is the "vertical dimensions test," which "examines whether the transaction at issue subjects a hypothetical creditor to economic risks different from those accepted when such creditor initially extended credit to the debtor." *Id.* The second prong is the "horizontal dimensions test," which involves a "comparison of the debtor's business to similar businesses to determine whether the transaction at issue is in the course of the debtor's business." *Id.* at 962–63. The bankruptcy court concluded that a transaction must "most likely" satisfy both prongs of the test before it can be considered within the ordinary course of business. *Id.* (citation omitted).

For the reasons set forth below, this court concludes that the bankruptcy court erred as a matter of law in adopting the two-pronged test to define the "ordinary course of business." The bankruptcy court further committed clear error by concluding that *all* of the overdraft credits extended post-petition were outside of the ordinary course of business.

### 1. The Vertical Dimensions Test

As the bankruptcy court noted, the vertical dimensions test was originally set forth in *In re James A. Phillips, Inc.*, 29 B.R. 391 (S.D.N.Y.1983), a case which involved a dispute over the propriety of certain payments made without notice to all creditors by the trustee pursuant to section 363(b)(1).[3] In undertaking to define the "ordinary course of business," the court observed:

> The touchstone of 'ordinariness' is ... the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its

business. So long as the transactions conducted are consistent with these expectations, creditors have no right to notice and hearing, because their objections are likely to relate to the bankrupt's chapter 11 status, not the particular transactions themselves.

*Id.* at 394. This test is applied from the perspective of a hypothetical creditor, and "inquires whether the transaction subjects a creditor to economic risks of a different nature from those he accepted when he decided to extend credit." *In re Johns–Manville Corp.*, 60 B.R. 612, 616 (Bankr.S.D.N.Y.1986), *rev'd on other grounds* 801 F.2d 60 (2d Cir. 1986).

The reasonable expectations test was modified and formally named the "vertical dimensions test" in *In re Waterfront Companies, Inc. v. Johnston,* 56 B.R. 31 (Bankr.D.Minn. 1985). In that case, the defendants argued that a post-petition indemnity agreement executed by the debtor without notice to the creditors was within the ordinary course of business under sections 363(c)(1) and 364(a). After observing that "[s]ome transactions either by their size, nature or both are not within the day-to-day operations of a business and are therefore extraordinary," the court concluded that the vertical dimensions test for the ordinary course of business was "whether or not the transaction is within the day-to-day business of the debtor without some kind of separate authorization."[4] *Id.* at 34. In rephrasing the test in this manner, the court did not explain why the reasonable expectations test was insufficient or document how the rephrased test was superior.

Several courts subsequently construed the term "ordinary course of business" as a transaction that occurred within the day-to-day business or operations of the debtor. *See In re Johns–Manville,* 60 B.R. at 618 (citations omitted). Yet, defining the "ordinary course of business" in this manner does

---

**3.** This section provides:
The trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate.
*11 U.S.C. § 363(b)(1).*

**4.** The *Waterfront* court ultimately concluded that the debtor's execution of the indemnity agree-

ment was an extraordinary transaction since a Minnesota statute required approval of that type of transaction by a corporation's board of directors, and, in certain circumstances, by two-thirds of the corporation's stockholders. *Id.* at 35.

not yield a facile, universally applicable standard against which a transaction can be objectively measured. The principal problem with the *Waterfront* test is that it seeks to define a broad phrase ("ordinary course of business") by using an equally broad phrase (the "day-to-day operations" of a business) without providing any standards to determine what may be considered within a business's day-to-day operations. Without such standards, defining a debtor's ordinary course of business based upon its day-to-day operations does not always yield predictable results.[5]

In contrast, the reasonable expectations test provides the necessary standards to determine whether a specific transaction is within the ordinary course of business.[6] The core of the reasonable expectations test is its analysis of the debtor's pre-petition conduct as a means to inform and develop expectations of its post-petition conduct. *See In re Johns–Manville*, 60 B.R. at 617. The debtor's pre-petition conduct is not, however, the sole reference for defining these expectations. *Id.* In applying this test, the court must also consider the changing circumstances that are inherent in a debtor's efforts to operate its business under chapter 11. *Id.; accord In re Roth Am., Inc.*, 975 F.2d 949, 953 (3d Cir.1992). The test seeks to discern "any significant alterations" in a debtor's pre- and post-petition activities. *Medical Malpractice Ins. Assoc. v. Hirsch (In re Lavigne)*, 183 B.R. 65, 70 (Bankr. S.D.N.Y.1995).

A creditor's reasonable expectations of a debtor's "ordinary course of business" are based in large part upon the debtor's specific pre-petition business practices and norms and the expectation that the debtor will conform to those practices and norms while operating as a debtor-in-possession. Thus, a fundamental characteristic of an "ordinary" post-petition business transaction is its similarity to a pre-petition business practice. *See In re James Phillips*, 29 B.R. at 394; *see also Marshack v. Orange Commercial Credit (In re National Lumber & Supply, Inc.)*, 184 B.R. 74 (9th Cir. BAP 1995) (to qualify for the ordinary course of business exception under section 547(c)(2), a debt and its payment must, *inter alia*, be "ordinary in relation to past practices between the debtor and that particular creditor").[7] A

---

**5.** For example, the frequency with which a particular transaction occurs within the day-to-day operations of a business does not determine whether the transaction is within the ordinary course of the business since a transaction may occur occasionally and still be considered ordinary. *See In re Finn*, 909 F.2d 903, 908 (6th Cir.1989) (a transaction can be in the ordinary course of business even if it is the first transaction undertaken); *In re Economy Milling Co.*, 37 B.R. 914, 922 (D.C.S.C.1983) ("The transaction need not have been common; it need only be ordinary. A transaction can be ordinary and still occur occasionally."). Similarly, the fact that a particular transaction is within the nature of the business's day-to-day operations does not necessarily establish that it occurred within the ordinary course of business. *See In re Cascade Oil Co.*, 51 B.R. 877, 882 (Bankr.D.Kan.1985) (although extending credit was within the bank's day-to-day business affairs, the credit transaction at issue was not extended within the ordinary course of business).

**6.** The *Waterfront* test can be reconciled with the reasonable expectations test to the extent that a business's day-to-day operations shape creditors' expectations of that business.

**7.** A debt payment made within the ninety (90) day preference period preceding the filing date of

a bankruptcy petition may be a voidable preference under section 547 unless the payment was made within the ordinary course of business under section 547(c)(2)(B). The analysis used by the courts to determine whether a debt payment was within the ordinary course of business under section 547(c)(2)(B) is similar to the analysis used to define the creditors' reasonable expectations of a debtor's post-petition transactions. Both analyses involve a comparison of the debtor's conduct during two distinctly different time periods: pre- and post onset of the ninety day preference period (section 547(c)(2)(B)); and pre- and post-petition (sections 363 and 364(a)). (As discussed *infra*, the court's analysis of the "ordinary course of business" under section 547(c)(2)(B) differs from the analysis under section 364(a) to the extent that the court must also analyze whether the debt payment comported to industry practice under section 547(c)(2)(C).) As a result of the similar methods of analysis, the standards used to define the "ordinary course of business" under section 547(c)(2)(B)—whether a pre-petition payment during the preference period "bore some consistency with other business transactions between the debtor and the creditor," *In re Magic Circle Energy Corp.*, 64 B.R. 269, 273 (Bankr.W.D.Okla.1986)—are useful in defining the "ordinary course of business" under section 364(a).

rigid similarity is not required; rather, the post-petition transaction must have "some consistency" with a pre-petition transaction. *See J.P. Fyfe, Inc. of Fla. v. Bradco Supply Corp.,* 96 B.R. 474, 476–77 (D.N.J.1988), *aff'd* 891 F.2d 66 (3d Cir.1989) (analyzing ordinary course of business under section 547(c)(2)). The size, nature and type of business, and the size and nature of the transactions in question are all relevant to determining whether the transactions are ordinary. *United States ex rel. Harrison v. Estate of Deutscher,* 115 B.R. 592, 598 (M.D.Tenn. 1990); *In re Johns–Manville,* 60 B.R. at 617.

Accordingly, a post-petition transaction undertaken by the debtor that is similar in size and nature to pre-petition transactions undertaken by the debtor would be within the ordinary course of business. *See Poff v. Poff Constr., Inc. (In re Poff),* 141 B.R. 104 (W.D.Va.1991) (creditors would reasonably expect that a debtor which had received unsecured loans from debtor's president for six years pre-petition would continue to borrow unsecured funds from the president post-petition). In contrast, a post-petition transaction undertaken by the debtor that it did not undertake pre-petition may be considered an extraordinary transaction since a creditor would not reasonably expect its occurrence. *See Pittsburgh Nat'l Bank v. SMB Holdings, Inc. (In re SMB Holdings, Inc.),* 77 B.R. 29, 32 (Bankr.W.D.Pa.1987) (bank's post-petition extension of overdraft credit to honor a debtor's check was not within the ordinary course of business where there was no indication that the debtor's account had ever been previously overdrawn). Moreover, a debtor's post-petition transactions may initially be within the ordinary course of business (*i.e.,* the transactions were similar to or had some consistency with pre-petition transactions) but subsequently may be transformed into extraordinary transactions where the post-petition transactions become dissimilar in size and nature to their pre-petition antecedents.

█ In this case, the bankruptcy court compared Garofalo's pre- and post-petition conduct and noted that "its overdraft activity changed dramatically post-petition." According to the bankruptcy court, FNB–Har-

vey "occasionally extended overdraft credit to [Garofalo's] in amounts less than $10,000" pre-petition. 164 B.R. at 963. Post-petition, the bankruptcy court observed that both the frequency—94 occasions—and the magnitude—"[b]y February 1991, the Bank was extending credit to the Debtor on a daily basis for sums often in excess of $200,000"— were significantly different from the pre-petition overdraft credit extensions. *Id.* at 964. The bankruptcy court concluded:

> [u]nder the vertical dimension test, neither [FNB–Harvey] nor the other interested parties, such as the Suppliers and Beverly Bank, would expect one of their grocery store customers as a Chapter 11 debtor-in-possession to be maintaining an undisclosed overdraft position on its principal checking account, which increased over time both as to amount and frequency on almost a daily basis, often for sums in excess of $200,000 to pay ordinary operating expenses.

*Id.* at 963. The bankruptcy court therefore held that *none* of the post-petition overdraft credit was extended within the ordinary course of business—a holding that this court concludes was clearly erroneous.

█ Rather, the facts establish that some of Garofalo's post-petition overdraft credits were obtained within the ordinary course of business but some were not. The bankruptcy court will need to determine the point in time at which the post-petition overdraft credits became so dissimilar to their pre-petition antecedents that they were transformed from ordinary into extraordinary transactions. In making this determination, the bankruptcy court should consider the following factors.

First, the bankruptcy court's finding that pre-petition, FNB–Harvey "occasionally" extended overdraft credit to Garofalo's in "amounts less than $10,000" is clearly erroneous. Plaintiff's Amended Exhibit 4R, which is Garofalo's checking account register from December 31, 1988, to April 24, 1991, reveals that Garofalo's overdrew its checking account fifty (50) different times in the seventeen (17) months preceding its bankruptcy petition. The amount of pre-petition overdrafts varied between a low of $431.93 and a

high of $58,384.01. The amount of overdraft credit extended during this time period totalled $780,070.21, yielding an average overdraft credit of $15,601.40 ($780,070.21 ÷ 50 = $15,601.40).

Even if the time-period for comparison is reduced from seventeen months to ten months, the scope of Garofalo's pre-petition overdraft usage does not change significantly. Specifically, FNB–Harvey extended overdraft credits post-petition from May 2, 1990, to March 12, 1991, a total of three hundred fourteen (314) days. The average amount of overdraft credit extended on a per occurrence basis during this time period was $24,904.23 ($2,340,997.40 ÷ 94 = $24,904.23).

During the same three hundred fourteen (314) day time period pre-petition (*i.e.,* June 21, 1989 until May 2, 1990), FNB–Harvey extended Garofalo's overdraft credit on thirty-nine (39) different occasions in the aggregate amount of $687,279.20. The average amount of overdraft credit extended on a per occurrence basis during this time period was $17,622.54 ($687,279.20 ÷ 39 = $17,622.54). In short, there are sufficient similarities between Garofalo's pre-petition and certain of its post-petition overdraft credit transactions to establish that some of the post-petition overdrafts occurred in the ordinary course of business.

Second, defining the point in time at which the ordinary credit transactions became extraordinary is not a rigid mathematical calculation determined as of the date on which the aggregate amount of post-petition overdraft credits exceeded the aggregate pre-petition amount or as of the date on which the frequency or magnitude of Garofalo's post-petition use exceeded the corresponding pre-petition levels. Rather, the court should consider the changing circumstances that a debtor-in-possession must face in attempting to operate its business. As such, depending upon the circumstances, the forty-fifth (45th) post-petition overdraft credit transaction may have been within the ordinary course of

business despite the fact that Garofalo's only overdrew its account on thirty-nine (39) different occasions during a similar pre-petition time frame.

▉ Third, as a practical matter, the fact that Garofalo's did not disclose the overdraft credits would not have immediately affected its creditors' reasonable expectations of its post-petition conduct. Pre-petition, Garofalo's creditors would not have had any reason to know of the overdraft protection unless Garofalo's or FNB–Harvey specifically disclosed it to them. Rather, the creditors would only have known that checks issued by Garofalo's prior to its bankruptcy petition were consistently honored by FNB–Harvey. As the overdrafts were promptly repaid by Garofalo's pre-petition, the use of overdraft credits would have been a non-issue. Post-petition, the creditors' expectations of checks issued by Garofalo's post-petition should not have changed, as long as FNB–Harvey continued to honor the checks. Thus, the fact that Garofalo's did not disclose the overdraft credits post-petition was initially of no consequence since section 364(a) permitted it to obtain unsecured credit in the ordinary course of business without notice to the court or its creditors. However, once Garofalo's was unable to timely repay the overdraft credits (as compared to its pre-petition repayments) and thus became chronically *indebted* to the bank, the fact that the overdraft credit protection was undisclosed became significant. At that point, Garofalo's use of the overdraft credits may have conflicted with its obligation as a debtor-in-possession to preserve the value of the estate.[8]

Accordingly, this court will remand this case to the bankruptcy court for the latter to determine which overdraft credit extensions occurred within the ordinary course of business and which were extraordinary transactions requiring notice and a hearing under subsections 364(b), (c) or (d). As previously discussed, this distinction is significant because it determines the types and priority of

---

8. The debtor-in-possession has a duty to use the continuing possession of the estate's assets to promote the value of the assets and thereby enhance the creditors' interests in those assets. *See In re Erickson,* 183 B.R. 189, 193 (Bankr. D.Minn.1995). The debtor fulfills this duty by using the assets in the ordinary course of business to generate revenues out of which cash payments to creditors will be made. *Id.* n. 10.

claims FNB–Harvey has against Garofalo's estate for the overdraft credits it extended.

### 2. The Unnecessary Horizontal Dimensions Test

 The second prong of the test adopted by the bankruptcy court to determine whether the overdraft credits were within the ordinary course of business was the "horizontal dimension" or "industry wide" test. The primary focus of this test "is external—this business vis-a-vis similar businesses." *In re Johns–Manville*, 60 B.R. at 617. More specifically, the test seeks to determine "whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business." *In re Dant & Russell*, 853 F.2d at 704; *see also In re Waterfront Companies*, 56 B.R. at 34 ("we compare this debtor's business to other businesses and based on the kind of business it is in, we decide whether a type of transaction is in the course of that debtor's business or in the course of some other business").

The bankruptcy court observed in this case that "several courts have held that a bank's covering of overdrafts is not generally in the ordinary course of business." 164 B.R. at 963 (citations omitted). It ultimately concluded that FNB–Harvey's "post-petition extensions of overdraft credit to the Debtor were highly unusual and outside of the ordinary course of its business" since the bank had only extended overdraft credit to twenty (20) of its eight hundred forty-seven (847) plus commercial accounts in amounts less than $50,000. *Id.* at 965.

Although widely used,[9] the bankruptcy court erred in applying the horizontal dimensions test to determine whether the overdraft credit was within the ordinary course of business under section 364(a). Section 364(a) does not require the court to analyze industry wide practices to determine whether a particular transaction was within the debtor's ordinary course of business; rather, industry wide practices are only relevant to determining whether a debt payment made during the

ninety (90) day preference period is a voidable preference or falls within the ordinary course of business exception contained in section 547(c)(2). *Compare 11 U.S.C. § 364(a)* (concerning obtaining post-petition credit in the ordinary course of business) *with id. §§ 547(c)(2)* (establishing that pre-petition debt payments made in the ordinary course of business are not voidable preferences).

### 1. The Horizontal Test is Not Required by Section 364(a)

 Section 547 provides in pertinent part:

(c) The trustee may not avoid under this section a transfer—

\* \* \* \* \* \*

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms; ...

*11 U.S.C. § 547(c)(2).* Whether a transfer was made in the ordinary course of business under this section is determined both subjectively, based upon the course of dealings between the debtor and transferee, and objectively, based upon industry practices or standards. *See In re Loretto Winery, Ltd.,* 107 B.R. 707 (9th Cir. BAP 1989); *Hills Oil & Transfer, Inc. v. Havana Nat'l Bank (In re Hills Oil & Transfer, Inc.),* 143 B.R. 207, 208 (Bankr.C.D.Ill.1992) *(citing* R. Ginsberg & R. Martin, *Bankruptcy: Text, Statutes, Rules* § 8.03(c), at 8–41–42 (3d ed. 1992)). The test's subjective and objective components result from the statutory text. If the definition of the ordinary course of business was based solely upon the parties' course of dealings, as many courts initially concluded, subpart (c)(2)(C) would be rendered superflu-

---

9. *See, e.g., In re Roth Am., Inc.,* 975 F.2d 949, 952 n. 2, 953 (3d Cir.1992); *In re Dant & Russell, Inc.,* 853 F.2d 700, 704–06 (9th Cir.1988); *In re The Drexel Burnham Lambert Group, Inc.,* 157 B.R. 532, 537 (S.D.N.Y.1993); *In re Waterfront Companies, Inc.,* 56 B.R. 31 (Bankr.D.Minn. 1985).

ous. *See id.; Solow v. Ogletree, Deakins, Nash, Smoak & Stewart (In re Midway Airlines, Inc.),* 180 B.R. 1009, 1013 (Bankr. N.D.Ill.1995) (*citing In re Tolona Pizza Products Corp.,* 3 F.3d 1029, 1031 (7th Cir. 1993)). Since well established principles of legislative interpretation dictate that Congress does not adopt superfluous statutory provisions, the majority of courts "now agree that 'ordinary business terms' in subdivision (C) refers to an 'objective standard to be shown by the custom in the industry in which the transferee and debtor are engaged.'" *In re Matter of Century Brass Products, Inc.,* 121 B.R. 136, 139 (Bankr.D.Conn.1990) (*quoting In re Loretto Winery, Ltd.,* 107 B.R. at 709–10); *accord In re Tolona Pizza Products Corp.,* 3 F.3d at 1031 ("'ordinary business terms' refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor engage ...") (emphasis in original). In short, but for subsection 547(c)(2)(C), the definition of the "ordinary course of business" under subsection 547(c)(2)(B) would be a subjective inquiry based upon the parties' prior course of dealings.

█ In contrast with section 547(c)(2), section 364(a) does not require that credit extended within the ordinary course of business must also be "made according to ordinary business terms" or other similarly phrased requirement. As demonstrated by the text and structure of section 547(c)(2), Congress could have required that post-petition credit be obtained within the ordinary course of business and according to ordinary business terms; however, it chose not to do so. The objective analysis of an industry's practice and custom required under section 547(c)(2)(C) is thus not required to determine whether credit was extended within the ordinary course of business under section 364(a). Because the objective "horizontal dimensions test" lacks a statutory basis under section 364(a), the bankruptcy court erred in using this test to determine whether the overdraft credit was extended within the ordinary course of business. The error, however, was harmless since it concluded that the overdraft credits did not pass either the vertical or horizontal dimensions test.

### 2. Other Problems with the Horizontal Dimensions Test

In addition, the horizontal dimensions test suffers from two practical problems that significantly restrict any value the test may add to determining whether a transaction is within a debtor's ordinary course of business. First, to the extent that the test is used to determine whether a transaction is consistent with the debtor business's nature or purpose, it is duplicative of the reasonable expectations test. In establishing the horizontal dimensions test, the court in *In re Waterfront Companies* offered the following example of its application:

> raising a crop would not be in the ordinary course of business for a widget manufacturer because that is not a widget manufacturer's ordinary business.

56 B.R. at 35. However, the reasonable expectations addresses the same question and produces the same conclusion: based upon a debtor's prior business practices, a reasonable creditor would not expect the (debtor) widget manufacturer to suddenly grow corn post-petition. The horizontal dimensions test is thus redundant with the reasonable expectations test in this regard.

Second, defining the proper industry for comparison is a problem plagued endeavor. As the Seventh Circuit observed in *In re Tolona Pizza Products Corp.,*

> Not only is it difficult to identify the industry whose norm shall govern (is it, here, the sale of sausages makers of pizza? The sale of sausages to anyone? The sale of anything to makers of pizza?), but there can be great variance in billing practices within an industry.

3 F.3d at 1033. In this case, the court defined the relevant industry as all of the bank's eight hundred forty-seven plus commercial customers. FNB–Harvey's argument that the relevant industry should be limited to the bank's four commercial grocery accounts (all of which had apparently overdrawn their accounts) is more persuasive since it more narrowly defines the industry based upon the debtor's line of business. Yet, neither the relevant industry used by the court nor the one suggested by the bank

sheds useful light on the more restrictive question of whether the overdraft credits were in the ordinary course of business between Garofalo's and FNB–Harvey. The value generated by the horizontal dimensions test does not justify the expenditure of resources required—particularly at trial—to define properly the relevant industry for comparison.

■ Accordingly, this court concludes as a matter of law that the reasonable expectations test is the *only* test to be used to determine whether a debtor obtained postpetition credit within the ordinary course of business under section 364(a).

B. Whether the Bankruptcy Court Authorized the Credits under Section 364(b)

■ Neither Garofalo's nor FNB–Harvey ever petitioned the bankruptcy court to authorize or approve the use of overdraft credit. Despite this glaring omission, FNB–Harvey argues that the overdraft credit was authorized under § 364(b) of the Code. Section 364(b) provides that "[t]he court, after notice and a hearing, may authorize the trustee to obtain unsecured credit ... allowable under section 503(b)(1) of this title as an administrative expense." FNB–Harvey argues that it satisfied the notice requirement of § 364(b), as defined in 11 U.S.C. § 102(1)(A), because the Suppliers had appropriate notice of the overdraft credit through Joseph, the Roundy's employee who served as Garofalo's bookkeeper. FNB–Harvey further argues that an actual hearing was not required under the terms of § 102(1)(B), which provides that an act may be authorized "without an actual hearing if such notice is given properly and if ... such a hearing is not requested timely by a party in interest." *11 U.S.C. § 102(1)(B)(1)(i)*. FNB–Harvey reasons that since the Suppliers did not request a hearing, the overdraft credit was authorized even though the court did not issue an actual order to that effect.

FNB–Harvey's argument fails on many different levels. First, the argument completely ignores the *court's* role in authorizing a trustee or debtor-in-possession to obtain unsecured credit. The record unequivocally establishes that neither FNB–Harvey nor Garofalo's ever disclosed the overdraft credits to the court or petitioned the court for approval of the credits. To argue that the bankruptcy court authorized the credit when the court was not even aware of the overdraft credit practice defies all logic and borders on frivolity. Second, the argument completely ignores the specific notice provisions of the Bankruptcy Rules for "obtaining credit." *See Fed.R.Bank.P. 4001(c)*. To obtain authorized credit, Garofalo's was required under Rule 4001(c)(1) to file a motion in accordance with Bankruptcy Rule 9014 and attach a copy of the credit agreement to the motion, neither of which was done. *Id.* § 4001(c)(1). In addition, Garofalo's was required to serve notice of the motion on "the creditors included on the list filed pursuant to Rule 1007(d) and on such other entities as the court may direct." *Id.* The notice of motion was also to include a notice of hearing for the motion. *Id.* § 4001(c)(3). Neither of these requirements was fulfilled. In short, the facts establish that the notice requirements of section 364(b), as specifically defined by Bankruptcy Rules 4001(c)(1) and (c)(3), were not satisfied. Third, without having received proper notice of the credit, the Suppliers (or any other creditor) could not have waived their rights to request a hearing on the propriety of the overdraft credit. Because the Suppliers were not even presented with the opportunity to request a hearing, FNB–Harvey's argument that the court could authorize the credit without a hearing under § 102(1)(B) fails. Finally, the bankruptcy court found that Joseph did not advise the Suppliers of the overdraft credits. *See* 164 B.R. at 170. This finding is supported by the record and thus not clearly erroneous. *See* Tr., at 330–33. Accordingly, contrary to FNB–Harvey's argument, the Suppliers did not have actual notice of the overdraft protection. In short, FNB–Harvey has failed to establish the factual predicate upon which it built its precarious argument that the bankruptcy court authorized the overdraft credit under § 364(b).

C. Retroactive Authorization

■ FNB–Harvey argues in the alternative that even if the overdraft credits were

not within the ordinary course of business or otherwise authorized under section 364(b), (c) or (d), the bankruptcy court should have retroactively authorized the credits as administrative expenses based upon the equities of this case. FNB–Harvey maintains that it is entitled to such relief because the bankruptcy court would have authorized the overdraft credits had a timely request been made (or so it surmises), the overdraft credits did not dilute the estate but rather inured to the benefit of the secured creditors, and it honestly believed that it had the authority make these transactions.

FNB–Harvey did not, however, present this argument to the bankruptcy court. The argument is therefore waived and cannot be pursued on appeal. *See In re Kroner,* 953 F.2d 317, 319 (7th Cir.1992) ("arguments not presented to the trial court are waived and cannot be raised for the first time on appeal"); *In re Winer,* 162 B.R. 781, 784 (N.D.Ill.1993). Accordingly, this court declines to grant retroactive administrative expense priority to the overdraft credits determined by the bankruptcy court (on remand) to have been extended outside of the ordinary course of business.[10]

### IV. Equitable Relief

In addition to its untimely request for retroactive approval of its overdraft credits, FNB–Harvey contends that it was entitled to equitable relief on two other grounds: first, the debtor's estate was unjustly enriched by the overdraft credits; and second, the damages recoverable under section 550 should have been limited to the harm actually suffered by the estate. Both claims, which are somewhat intertwined, result from the bankruptcy court's judgment under the plain text of section 550 that FNB–Harvey must disgorge all of the $2.3 million in funds it set-off from Garofalo's checking account deposits to repay the extended overdraft credits.

According to FNB–Harvey, permitting the trustee to avoid and recover all of the funds the bank set-off in this manner would unjustly enrich the bankruptcy estate and its secured creditors at the bank's considerable expense. The alleged windfall results, in part, because the Suppliers directly benefited from the bank's decision to extend overdraft protection. Without the overdraft credits, Garofalo's checks to its Suppliers would have been rendered non-negotiable due to insufficient funds; with the overdraft credit, the same checks were honored and the Suppliers' claims were paid. Moreover, the goods purchased in this manner became additional collateral under the cash collateral orders and thus added value to the estate. In addition, the bank contends that a windfall will occur because the Suppliers will reap the primary benefits associated with FNB–Harvey's $2.3

10. Even if this argument had not been waived, FNB–Harvey has not demonstrated that it is entitled to this extraordinary relief. The bank cites the decisions in *In re Avorn Dress Co.,* 79 F.2d 337 (2d Cir.1935), and *In re American Cooler,* 125 F.2d 496, 497 (2d Cir.1942), for the standards it contends determine whether a court may grant such equitable retroactive relief. The persuasive authority of these decisions is questionable since Congress has substantially (and repeatedly) changed the nature and scope of the bankruptcy court's equitable powers in the intervening years.

As discussed in greater detail in section IV *infra,* a bankruptcy court's exercise of its equitable authority must be consistent with the purposes of the Bankruptcy Code. Granting a claim retroactive administrative expense priority is, at a very basic level, inconsistent with the Code's legislative intent. Retroactive authorizations are generally disfavored because they "circumvent Congress' determination that before a court authorizes a post-petition transfer, prior notice

must be given to creditors." *In re Photo Promotion Assoc., Inc.,* 881 F.2d at 9. Moreover, by granting preferential status to claims not intended by Congress to have any priority, retroactive authorizations may dilute the value of priorities specifically established by Congress. *See In re Jartran, Inc.,* 732 F.2d 584, 586 (7th Cir.1984); *accord In re Cascade Oil,* 51 B.R. at 881. Accordingly, the Seventh Circuit has concluded that "priority should not be afforded unless it is founded on a clear statutory purpose." *Id.* As such, a bankruptcy court may only grant equitable relief where a claim seeking retroactive administrative expense priority comports "with the language and underlying purposes of section 503." *Id.* (citing *In re Chicago, Milwaukee, St. Paul & Pac. R.R.,* 658 F.2d 1149, 1163 (7th Cir.1981) (general rule is equality of distribution; deviation must appear in the statute)). Notwithstanding the waiver, FNB–Harvey's claim would have failed because the bank did not establish that its request for retroactive administrative expense status comported with the language and purpose of section 503.

million repayment. The infusion of these funds into the estate should ensure that the secured creditors will fully recover their secured, priority claims. Any remaining funds would be used to pay the administrative and unsecured claims according to the priorities assigned to these claims by the Code. FNB–Harvey surmises that it will recover little, if any, of the disgorged funds. It argues that such a result would be unjust since the overdraft credits allegedly aided rather than harmed the estate.[11] FNB–Harvey therefore charges that the bankruptcy court erred in rejecting its unjust enrichment defense.

In a related argument, FNB–Harvey argues that the bankruptcy court erred by applying the plain text of section 550 to determine that the bank must disgorge and repay $2.3 million to the estate. It contends that the bankruptcy court's strict construction of section 550 yielded an absurd result that was contrary to the purpose of the Code's avoidance provisions; namely, to make the estate whole. In light of this purpose, FNB–Harvey argues that if it is found liable, its liability should be limited to the "eventual result of its conduct"—meaning the harm actually suffered by the estate. In effect, FNB–Harvey is arguing that the bankruptcy court should have disregarded the plain text of section 550 and exercised its equitable powers to limit the trustee's recovery to the actual harm suffered by the estate. It further argues in this regard that the bankruptcy court erred by failing to determine whether specific overdraft credits dissipated or enhanced the value of the estate.

Both of these equitable claims fail. Regardless of whether the bank styles its claims for equitable relief as a remedy for unjust enrichment or as a limitation on recoverable damages, the bankruptcy court properly concluded that FNB–Harvey was not entitled to any equitable relief as a matter of law.

## A. The Bankruptcy Court's Equitable Powers

"The bankruptcy court's equitable powers, found in 11 U.S.C. § 105, enable to court 'to

issue any order, process or judgment that is necessary or appropriate to carry out provisions' of the Code." *In re Lloyd,* 37 F.3d 271, 275 (7th Cir.1994) (*quoting 11 U.S.C. § 105* ). However, the bankruptcy court's ability to decide matters based upon equitable considerations is limited: "[w]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 968–69, 99 L.Ed.2d 169 (1988); *accord In re Lloyd,* 37 F.3d at 275; *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1361 (7th Cir.1990).

Absent specific statutory authority, a bankruptcy court may not apply its general equitable powers to disregard or contravene the Code's unambiguous provisions. *See AFCO Credit Corp. v. Baxco Corp. (In re Baxco Corp.),* 148 B.R. 855, 859 (Bankr. N.D.Ill.1992) (where the court refused to "deviate from the plain language of the Code ... and apply equitable considerations to uphold an otherwise avoidable transfer" under section 549); *In re Middleton Arms, Ltd. Partnership,* 934 F.2d 723, 725 (6th Cir.1991) ("bankruptcy courts cannot use equitable principles to disregard unambiguous statutory language"); *see also Levit v. Ingersoll Rand Fin. Corp.,* 874 F.2d 1186, 1198 n. 10 (7th Cir.1989) ("Whatever force the assertion in *Bank of Marin v. England* [citation omitted] that 'equitable principles govern the exercise of bankruptcy jurisdiction' may have had under the 1898 Act, this approach has no place under the Code to the extent the statute addresses the question."); *Bonded Fin. Serv., Inc. v. European Am. Bank,* 838 F.2d 890, 894–95 (7th Cir.1988) ("We have serious doubts ... about the propriety of judges' declining to enforce statutes that produce inequitable results. Bankruptcy statutes are not special cases."); *Boston & Maine Corp. v. Chicago Pac. Corp.,* 785 F.2d 562, 566 (7th Cir.1986) (equitable considerations do not override the bankruptcy law). Rather, the

---

11. The overdraft credit helped Garofalo's operate as a debtor-in-possession for approximately ten (10) months; during this time period, Garofalo's reduced the amount of debt it owed the Suppliers by approximately $267,500.

function of the bankruptcy court is "to marshall the debtor's assets and distribute them according to the property rights of the creditors" in accordance with the specific provisions of the bankruptcy code. *See In re Iowa R.R. Co.,* 840 F.2d 535, 536 (7th Cir.), *cert. denied* 488 U.S. 899, 109 S.Ct. 244, 102 L.Ed.2d 233 (1988).

Even where the Code permits application of equitable principles, the court's equitable powers are constrained. As the Seventh Circuit has observed, "Justice in a bankruptcy case is decision according to law." *In re Iowa R.R. Co.,* 840 F.2d at 536. "Equity in law *is* the consistent application of legal rules. The definition of *in* equity is unequal application of norms." *Id. (citing Boston & Maine Corp.,* 785 F.2d at 566) (emphasis in original). As such, the bankruptcy court judge does not have a "free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness...." *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 791 F.2d 524, 527 (7th Cir.1986), *cert. denied* 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982). Rather, the bankruptcy court may only exercise its equitable powers in a manner consistent with the Code. *In re Lloyd,* 37 F.3d at 275 (*citing In re SPM Mfg. Corp.,* 984 F.2d 1305, 1311 (1st Cir.1993)). To that end, the purpose of equitable considerations is to guide the bankruptcy court in dividing a pie that is "too small to allow each creditor to get the slice for which he originally contracted." *In re Chicago, Milwaukee, St. Paul & Pac. Ry.,* 791 F.2d at 527 (citation omitted).

**B. Application**

 In this case, the bankruptcy court properly determined not only the amount of damages the trustee may avoid and recover but also that the plain text of sections 549 and 550 precluded it from granting any equitable relief with respect to the amount of the recovery. The bankruptcy court must apply the plain meaning of the Bankruptcy Code. *See Union Bank v. Wolas,* 502 U.S. 151, 112 S.Ct. 527, 531, 116

L.Ed.2d 514 (1991); *United States v. Nordic Village, Inc.,* 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *In re Coordinated Apparel, Inc.,* 179 B.R. 40, 42 (Bankr.S.D.N.Y. 1995) ("[t]he Supreme Court has stated that when the language of the Bankruptcy Code is clear and unambiguous, the plain meaning of the statute controls its interpretation, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters'") (*quoting U.S. v. Ron Pair Enter., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989)). Under the plain text of sections 549 and 550, the trustee may avoid and recover a post-petition transfers of property of the estate that were not authorized by either the Code or the court. *See, e.g., In re Baxco Corp.,* 148 B.R. 855, 859 (Bankr.N.D.Ill.1992) (section 549 allows the trustee to avoid unauthorized post-petition secured loans). Section 549(a) provides in this regard:

> Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
>
> (1) that occurs after the commencement of the case; and
>
> (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
>
> (2)(B) that is not authorized under this title or by the court.[12]

*11 U.S.C. § 549(a).* Section 550(a) provides in pertinent part:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 549, ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> (1) the initial transferee of such transfer
>
> ...

*Id. § 550(a).*

To apply these statutory provisions to the facts of this case, the bankruptcy court had to make two separate determinations: first, whether the bank's multiple set-offs of Garo-

---

12. The bankruptcy court found and FNB–Harvey does not dispute that the two exceptions do not

apply in this case. 164 B.R. at 967.

falo's checking account deposits as repayment for the overdraft credits it extended constituted "transfers of the property of the estate;" and second, if so, whether the set-offs (*i.e.*, transfers) were authorized by the Code or the court. The bankruptcy court properly concluded that Garofalo's cash deposits were property of the estate under subsections 541(a)(6) and 541(a)(7). 164 B.R. at 968. It further correctly concluded that the bank's set-offs of those funds were transfers of the estate's property pursuant to Code subsection 101(58)[54].[13] *See Brook v. Republic Bank (In re Clearwater Discount Marine, Inc.)*, 150 B.R. 74, 76 (Bankr. M.D.Fla.1993) (bank's post-petition application of monies on deposit in debtor-in-possession's account to certain pre- and post-petition debts owed to the bank by the debtor "[c]learly ... was a transfer, because, after freezing and applying the balance, the Debtor no longer had what it once had, *i.e.*, a right to withdraw the balance on the account."). As a result, the trustee can avoid and recover from FNB–Harvey the value of each set-off (the aggregate sum of which totalled $2,315,901.22) under sections 549(a) and 550(a), provided these *transfers* were not authorized by the Code or the bankruptcy court.[14]

◼ The bankruptcy court, which first learned of the overdraft credit extensions and repayment process after it converted the case from chapter 11 to a chapter 7 proceeding, certainly did not authorize FNB–Harvey to set-off funds from Garofalo's checking account deposits. The set-offs were similarly

not authorized under any provision of the bankruptcy code.[15] *See In re Clearwater Discount Marine*, 150 B.R. at 77 (bank's application of the balance of the debtor's account against debts owed the bank was an impermissible set-off); *McLemore v. Citizens Bank of Cookeville (In re Tom McCormick Enter., Inc.)*, 26 B.R. 437, 439 (Bankr. M.D.Tenn.) ("bank's unilateral appropriation of funds from the debtor-in-possession's account [which the bank credited to the debtor's pre-petition debt] was not sanctioned by the very narrow exceptions contained in section § 549"), *aff'd* 32 B.R. 992 (M.D.Tenn. 1983). Accordingly, the bankruptcy court properly applied the plain terms of sections 549(a) and 550(a) and concluded that the Trustee may recover and FNB–Harvey must disgorge the aggregate amount of the deposits set-off by the bank. *See In re Photo Promotion Assoc., Inc.*, 881 F.2d 6, 7–9 (2d Cir.1989) (where the court held that the trustee could compel a chapter 11 creditor who had collected an unauthorized assignment of the debtor-in-possession's accounts receivable in violation of section 364(c) to disgorge the monies it collected even though the creditor had a valid administrative claim to those funds under section 503(b)); *In re Tom McCormick Enter., Inc.*, 26 B.R. at 440–41 (where the court held that the trustee may avoid and recover and the bank must disgorge the $60,000 in funds it improperly set-off from the debtor-in-possession's bank account). Moreover, because this result was compelled by the plain language of the Code, the bankruptcy court properly concluded that

---

**13.** The Code defines a "transfer" as

> every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

> *11 U.S.C. § 101(58)[54].*

**14.** Whether the funds set-off by the bank were authorized by the Code or by the court is a separate and distinct issue from whether the overdraft credits extended by the bank were made in the ordinary course of business under section 364(a) or approved by the court under sections 364(b), (c) and (d).

**15.** Section 364 only authorizes the debtor-in-possession to obtain unsecured credit either in the ordinary course of business or upon notice and

hearing; it does not authorize the provider of this unsecured credit (*i.e.*, the bank) to contemporaneously recover the value of the credit extended from the debtor-in-possession. Rather, section 364 specifically provides such a creditor with an administrative expense *claim* (of varying priority depending upon the applicable subsection) that may only be recovered from the estate upon petition to the court or at the final disposition of the case in accordance with the Code's priority scheme. By setting off Garofalo's cash deposits, the bank unilaterally and improperly afforded itself a superpriority status over all other creditors' claims. *See McLemore v. Citizens Bank of Cookeville (In re Tom McCormick Enter., Inc.)*, 26 B.R. 437, 439 (Bankr.M.D.Tenn.), *aff'd* 32 B.R. 992 (M.D.Tenn.1983).

it did not have the authority (and will not have the authority on remand) to award any equitable relief in contravention of the Code's unambiguous provisions. *See In re Baxco Corp.*, 148 B.R. at 859 (where the court refused to "deviate from the plain language of the Code ... and apply equitable considerations to uphold an otherwise avoidable transfer" under section 549).

■ FNB–Harvey must therefore disgorge to the estate the sum of $2,315,901.22. The bankruptcy court shall determine on remand the exact amount of the overdraft credits that were extended by the bank within the ordinary course of business; the bank shall have an administrative expense claim equal to this amount pursuant to section 364(a). The bankruptcy court shall further determine on remand that the remaining balance of the overdraft credits were extended outside of the ordinary course of business; the bank shall have a general unsecured claim equal to this amount. The bank may then pursue its administrative expense claim and unsecured claim (the sum of which shall total $2,340,997.40) against the estate just like any other creditor of the estate.[16] *See In re Photo Promotion Assoc., Inc.*, 881 F.2d at 8–10.

### V. Violation of the Automatic Stay

■ FNB–Harvey next contends that the bankruptcy court erred when it concluded that the bank wilfully violated the automatic stay by applying funds deposited by Garofalo's to repay the overdraft credits extended. *See* 164 B.R. at 971–72. FNB–Harvey raises two arguments in this regard: first, the stay only applies to actions taken to collect pre-petition claims; and second, it only accepted cash deposits—it did not "setoff" or otherwise obtain possession of or control over these funds. Under section 362, the filing of a chapter 11 bankruptcy petition stays "any act to obtain possession of property of the estate or property from the estate or to exercise control over property of the estate." *11 U.S.C. § 362(a)(3)*. It similarly stays "any act to create, perfect, or enforce any lien against property of the estate." *Id.* § 362(a)(4).

■ The automatic stay has dual purposes. It protects the debtor from its pre-petition creditors by stopping "all collection efforts, all harassment, and all foreclosure actions" while permitting the debtor "to attempt a repayment or reorganization plan...." *H.R.Rep. No. 595*, 95th Cong., 1st Sess. 340 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6296–97. It similarly protects all creditors by ensuring that the estate will be preserved against attempts by other creditors to gain an unfair advantage with respect to the payment of claims. *Id.; Knopfler v. Glidden Co. (In re Germansen Decorating, Inc.)*, 149 B.R. 517, 521 (Bankr.N.D.Ill.1992); *Yorke v. Citibank, N.A. (In re BNT Terminals, Inc.)*, 125 B.R.

---

16. Although this result may seem harsh, it comports with the plain language of the Bankruptcy Code and the sage advice of a respected commentator. *See* 2 *Collier on Bankruptcy* ¶ 364.03, at 364–8 (L. King 15th ed. 1994) ("Due to the severe consequences arising from misconceptions concerning whether a credit extension is in the ordinary course of business or not, lenders will be well advised to err on the side of caution where there is any doubt."). As the bankruptcy court observed, FNB–Harvey could have sought the safe harbor of sections 364(c) and 364(d) after notice and a hearing but chose not to do so. FNB–Harvey therefore "must suffer the consequences." 164 B.R. at 966.

Finally, as a practical matter, the remand may not benefit FNB–Harvey at all. The Suppliers and Beverly Bank have secured claims of at least $1.43 million ($1.7 million at the filing of the chapter 11 petition minus the $267,500 in secured claims repaid during the chapter 11 proceedings), which are the top priority for repayment. *See* Cash Collateral Order dated November 13, 1990. As a result, approximately $900,-000 of the $2.31 million to be disgorged by FNB–Harvey will remain to pay the chapter 7 administrative expenses, the chapter 11 administrative expenses and the general unsecured creditors' claims (in that order). Depending upon the amount of chapter 7 expenses, FNB–Harvey may be able to recover some (or possibly all) of the administrative expense claim it obtained under section 364(a). The percentage of recovery will depend in large part upon the aggregate amount of overdraft credits determined by the bankruptcy court on remand to have been extended within the ordinary course of business under section 364(a). In the extremely unlikely event that there are funds remaining after payment of all the administrative expense claims, FNB–Harvey will be able to recover a pro-rata share of its unsecured claims. As a result of the $2.31 million repayment, FNB–Harvey will be Garofalo's largest unsecured creditor.

963, 971 (Bankr.N.D.Ill.1991) (*citing Martin–Trigona v. Champion Fed. Sav. & Loan Ass'n,* 892 F.2d 575, 577 (7th Cir.1989)). The purpose of the stay is thus not confined to pre-petition debts as FNB–Harvey suggests. Rather, it protects and preserves the value of a chapter 11 estate against post-petition creditors who, without court approval, seek to take the property of the estate in satisfaction of their post-petition claims.[17] *See National Tax Credit Partners, L.P. v. Havlik,* 20 F.3d 705, 707 (7th Cir.1994) (section 362(a)(3) encompasses every effort to "exercise control over the estate"); *Bellini Imports, Ltd. v. Mason & Dixon Lines,* 944 F.2d 199, 201 (4th Cir.1991) (a judgment obtained as a result of a post-petition claim is subject to sections 362(a)(3) and 362(a)(4) such that a creditor must obtain an order modifying the stay before seeking to enforce the judgment against the estate); *Fazio v. Growth Dev. Corp. (In re Growth Dev. Corp.),* 168 B.R. 1009, 1016 (Bankr.N.D.Ga. 1994) ("[T]he mere fact a claim arises postpetition does not automatically entitle a creditor to enforce it, . . . . The language of [section 362(a)(3)] is devoid of any distinction between prepetition and postpetition claims. So long as a creditor attempts to obtain property of the estate, the automatic stay remains in full force and effect."); *In re BNT Terminals,* 125 B.R. at 971 ("The court will not tolerate unauthorized acts by debtors or creditors by allowing possession of, or facilitating the exercise of control over, or permitting the dismemberment of property of the estate outside the provisions of the Code. To do so would make a nullity of section 362 . . . ."); *In re Shuman,* 122 B.R. 317, 318 (Bankr.S.D.Ohio 1990). Violations of the automatic stay are void and without effect.[18]

*See In re Germansen Decorating, Inc.,* 149 B.R. at 522; *In re BNT Terminals, Inc.,* 125 B.R. at 971 ("the majority of Circuit Court cases hold that acts in violation of the automatic stay are void").

A quick review of Garofalo's checking account ledger demonstrates quite convincingly that FNB–Harvey set-off funds deposited by Garofalo's in violation of the stay. FNB–Harvey extended its own funds to Garofalo's in the form of overdraft credits and then used Garofalo's subsequent deposits to repay, either in whole or in part, the overdraft credits extended. Whenever FNB–Harvey used funds deposited by Garofalo's to repay an overdraft credit (or portion thereof), the funds were no longer available to Garofalo's for its use or possession. *See In re Clearwater Discount Marine,* 150 B.R. at 76. The bank's repayment practice ultimately created a cycle of dependency; as a result of a preceding setoff, Garofalo's account lacked sufficient funds to cover checks subsequently drawn on the account, thereby prompting the bank to extend additional overdraft credit. The bankruptcy court's conclusion that the "Bank took actions to obtain possession of and control over that property [the funds Garofalo's deposited] of the estate" is thus well founded. *See* 164 B.R. at 971. Moreover, by setting off Garofalo's deposits in this manner without court approval, FNB–Harvey accorded its claims superpriority status over the claims of all the other creditors, both secured and unsecured. The bankruptcy court properly concluded that FNB–Harvey violated section 362(a)(3).[19] *See In re Germansen Decorating, Inc.,* 149 B.R. at 521; *In re BNT Terminals,* 125 B.R. at 971 (post-petition sale of debtor's terminal facility

---

17. It is well established that claims arising postpetition are not subject to the automatic stay. *See Holland Am. Ins. Co. v. Succession of Roy,* 777 F.2d 992, 996 (5th Cir.1985) ("[t]he stay simply does not apply to post-bankruptcy events"); *FAA v. Gull Air, Inc. (In re Gull Air, Inc.),* 890 F.2d 1255, 1263 (1st Cir.1989). The question here, however, is not whether the automatic stay precludes FNB–Harvey from asserting claims for its post-petition overdraft credits (it clearly does not). Rather, the question is whether *enforcement* of these claims is prohibited by the stay in the absence of a court order modifying the stay.

18. The Seventh Circuit has reserved for future decision whether enforcement of a judgment in violation of the automatic stay is void or voidable. *See York Center Park Dist. v. Krilich,* 40 F.3d 205, 207 (7th Cir.1994).

19. For the same reasons, the bankruptcy court properly concluded that FNB–Harvey's set-offs violated the cash collateral orders. FNB–Harvey did not directly contest this finding on appeal.

and disbursement of sale proceeds without court approval violated automatic stay).

■ As a result, each post-petition set-off that occurred while the stay was in effect violated section 362(a)(3) and is therefore deemed void and without effect. The trustee may recover from FNB–Harvey the aggregate sum of all monies it set-off from Garofalo's deposits from May 2, 1990, until March 7, 1991, the day on which the bankruptcy court lifted the stay and docketed the order confirming the plan. *See In re Germansen,* 149 B.R. at 520 ("any transfer in violation of the automatic stay is void and without legal effect").

A question arises whether the trustee may avoid and recover under section 549(a) and 550(a) transactions that are rendered void and without effect under section 362. The amount of the recovery is virtually the same under either legal theory.[20] The bankruptcy court did not address this issue, and this court declines to resolve it since the recovery is duplicative and since the Trustee's primary motivation for alleging a violation of section 362 was to establish his claim for recovery of attorneys' fees under 362(h).[21]

### VI. Recovery Attorney Fees

■ On cross-appeal, the Trustee contends that he is automatically entitled to recover his attorney's fees under section 362(h) since the bankruptcy court found, and FNB–Harvey did not contest, that the bank wilfully violated the automatic stay. Section 362(h) provides:

An individual injured by any willful violation of a stay provided by this section *shall* recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

*11 U.S.C. § 362(h)* (emphasis added).

The bankruptcy court denied the Trustee's claim for attorney's fees on the ground that

the Trustee, although an individual because he is a natural person, could not demonstrate that he had been injured for the purposes of section 362(h). 164 B.R. at 972. The bankruptcy court noted in this regard that the Trustee, who was not appointed until after FNB–Harvey violated the stay, prosecuted this adversary action in his representative capacity on behalf of the estate rather than in his personal capacity. Since the Trustee could not prove that he had sustained an injury either personally or as a representative of the estate, the bankruptcy court concluded that the "uninjured Trustee was not entitled to compensatory damages, including attorney's fees under section 362(h)." *Id.* at 972–73. The bankruptcy court also observed that section 362(h) only protects "debtors and pre-petition creditors who are individual human beings." *Id.* at 972.

Citing the plain text of section 362(h), the Trustee argues that the court must award him his attorney's fees since, as trustee, he stood in the shoes of *all* of Garofalo's creditors in prosecuting this adversary action and because the attorney's fees he incurred are actual damages specifically recoverable under this section.

■ It is well established that awarding attorney's fees to an individual injured under section 362(h) is mandatory rather than discretionary once the court has found that a party willfully violated the automatic stay. *See Havelock v. Taxel (In re Pace),* 159 B.R. 890, 901 (9th Cir. BAP 1993) (citations omitted), *aff'd in part and rev'd in part,* 56 F.3d 1170 (9th Cir.1995). The determinative issue, however, is whether the party petitioning the court for this mandatory award is an "individual" injured within the meaning of section 362(h).

Neither the Bankruptcy Code nor its legislative history defines the term "individual."[22]

---

**20.** FNB–Harvey set-off $212,114.31 of Garofalo's deposits after the March 7, 1991. While these transactions are not void as violative of section 362(a)(3), the trustee may avoid and recover them under sections 549(a) and 550(a).

**21.** Having affirmed the bankruptcy court's finding of a violation of section 362(a)(3), this court

need not resolve FNB–Harvey's contention that it did not violate section 362(a)(4).

**22.** Section 362(h) was "within the subtitle entitled "Consumer Credit Amendments" relating only to individuals in the Bankruptcy Amendments and Federal Judgeship Act of 1984." *In re Prairie Trunk Ry.,* 125 B.R. 217, 220 (Bankr. N.D.Ill.1991) (*citing In re Chateaugay Corp.,* 920

**438**

Four circuit courts are presently divided over the question of whether "individual" is limited to a natural person or may include a corporation as well.[23] *See McRoberts v. S.I.V.I, (In re Bequette),* 184 B.R. 327, 334–35 (Bankr.S.D.Ill.1995) (listing the divided circuits and noting that the Seventh Circuit has not yet ruled on this issue); *In re Midway Indus. Contractors, Inc.,* 178 B.R. 734, 738 (N.D.Ill.1995) (a corporation is not an individual under section 362(h)); *Consolidated Rail Corp. v. Gallatin State Bank,* 173 B.R. 146 (N.D.Ill.1992) (same). The corollary question before this court is whether a chapter 7 trustee, who has filed a proceeding on behalf of the estate in his representative rather than individual capacity, can sustain an "individual injury" within the meaning of section 362(h). The answers to these questions depend upon how narrowly the courts define "individual."

The Ninth Circuit, citing the bankruptcy court's opinion in this case with approval, recently concluded that a chapter 7 trustee could not recover attorney's fees as damages under section 362(h). *See In re Pace,* 56 F.3d 1170, 1175–76 (9th Cir.1995). The court reasoned that "an individual's status as a trustee precludes any finding that the trustee suffered any damages as an individual, because any harm suffered in the form of costs and attorney's fees is actually incurred by a thing, *viz.,* the bankruptcy estate, and not by the trustee as a natural person." *Id.* at 1175. As such, the *Pace* court concluded that a trustee, who can be an "individual" if he or she is a natural person, was nonetheless not an "individual" for the purposes of section 362(h) where the trustee represented the estate. *Id.* at 1176; *accord Sosne v. Reinert & Duree, P.C., (In re Just Brakes Corporate Sys., Inc.),* 175 B.R. 288, 291–92 (Bankr. E.D.Mo.1994) (trustee, who was not acting in his individual capacity but rather on behalf of the bankruptcy estate of a corporate debtor, was not entitled to attorney's fees under section 362(h)).

The definition of "individual" is more encompassing than a "natural person." Black's Law Dictionary defines "individual" as follows:

> As a noun, this term denotes a single person as distinguished from a group or class, and also, very commonly, a private or natural person as distinguished from a partnership, corporation, or association, but it is said that this restrictive signification is not necessarily inherent in the word, and that it may, in proper cases, include artificial persons.

*Black's Law Dictionary* 696 (5th ed. 1979). Webster's Dictionary similarly defines "individual" as follows:

> 1: a single or particular being or thing or group of beings or things: as a: a particular being or thing as distinguished from a class, species, or collection ... 2: an indivisible entity or a totality which cannot be separated into parts without altering the character or significance of these parts ...

*Webster's Third New International Dictionary* 1152 (1961). Under these more expansive definitions, a chapter 7 trustee may properly be considered an "individual" since the trustee always files an adversary action on behalf of an artificial entity (*i.e.,* the bankruptcy estate) rather than in his individual capacity. Under these special circumstances, it is appropriate to define an "individual" less restrictively than a natural person. *See, e.g., Budget Serv. Co. v. Better Homes of Va.,* 804 F.2d 289, 292 (4th Cir.1986) (where the court concluded that section 362(h) must be read in conjunction with the rest of section 362 rather than literally and that "it seems unlikely that Congress meant to give a remedy only to individual debtors ... as opposed to debtors which are corporations or other like entities. Such a narrow construction would defeat much of the purpose of the section ..."); *Uecker v. Davidson (In re Bair Island Marina & Office Ctr.),* 116 B.R. 180, 185 n. 2 (Bankr.N.D.Cal.1990) (citations omitted) (this court reads "individual" in section 362(h) as

---

F.2d 183 (2d Cir.1990)). In the absence of any legislative history, any conclusion that Congress might have intentionally limited section 362(h) to natural persons based upon section 362(h)'s enactment as part of the "Consumer Credit Amendments" is purely speculative. *Id.* at 220–21. Such "judicial conjecture" is improper. *See id.*

**23.** The Seventh Circuit has not yet addressed this issue.

meaning "entity" as defined in 11 U.S.C. § 101(14) [sic § 101(15) ]"); *but see In re Prairie Trunk,* 125 B.R. 217 (N.D.Ill.1991) (declining to follow the reasoning of *Better Homes* ).

The court in *In re Prairie Trunk* followed the plain meaning rule of construction set forth in *United States v. Ron Pair Enterprises, Inc.,* and concluded that "individual" meant a "natural person in the common usage of the word." 125 B.R. at 221. It therefore concluded that a corporation was not an "individual" under section 362(h) and could not recover damages thereunder. *Id.* at 221, 222. Although the court acknowledged that the second portion of the Black's Law Dictionary definition of "individual" did not limit the term to natural persons, it nonetheless concluded that "the former portion of the definition is more in keeping with the plain meaning rule of construction mandated by *Ron Pair.*"

The Supreme Court in *Ron Pair,* however, recognized an exception to the plain meaning rule in "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters." 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989). Relying on this exception, this court concludes that applying the more narrow, common usage definition of "individual" to determine whether a chapter 7 bankruptcy trustee (as opposed to a corporation) may recover damages under section 362(h) will produce a result demonstrably at odds with Congress' presumed intent.[24]

■ For example, there are many situations in which a creditor willfully violates the automatic stay by acting to take possession of estate property. Under section 704(a), the trustee is obligated to recover the property for the benefit of the estate. *See 11 U.S.C. § 704(a)* (the trustee is required to "collect and reduce to money the property of the estate . . . ."). If the trustee incurs legal ex-

penses in recovering such property and cannot recover his fees from the party that violated the stay, either the estate will be depleted by the amount of the trustee's costs of recovery or the trustee will not be reimbursed for those costs. Either of these results is clearly undesirable. By adopting a broader definition of "individual" (*i.e.,* one based upon the second portion of the Black's Law Dictionary definition), the court avoids these undesirable results while at the same time ensuring that the goal Congress certainly sought to create (*i.e.,* enforcement of the automatic stay) and the incentive it created to achieve that goal (*i.e.,* the possible recovery of attorney's fees) are properly preserved. Thus, in the absence of clear language to the contrary, this court declines to apply the narrow definition of "individual" adopted by the bankruptcy court and the Ninth Circuit and instead finds that a chapter 7 trustee is an "individual" for the purposes of section 362(h).[25]

Section 362(h) thus permits a chapter 7 trustee to recover actual damages sustained by the individual bankruptcy estate as a result of a wilful violation of the automatic stay. The attorney's fees incurred by the trustee in prosecuting such an action are a type of actual damages sustained by the estate. *See 11 U.S.C. § 362(h); In re Burke,* 147 B.R. 955, 959 (Bankr.W.D.Mo.1992) (finding that the trustee was damaged by defendant's willful violation of § 362(a)(3) in the amount equal to "the attorney fees expended to prosecute the instant action" and thereby permitted the trustee to recover those fees); *In re Omni Graphics, Inc.,* 119 B.R. 641, 645 (Bankr.E.D.Wis.1990) ("attorneys' fees and costs are, in and of themselves, a form of damages under section 362(h) which can be awarded in the absence of other actual damages"). Accordingly, this court concludes that the bankruptcy court erred in denying the Trustee's motion for attorney's fees.

---

**24.** This conclusion is strictly limited to cases in which a *chapter 7 trustee* seeks to recover attorney's fees or other actual damages under section 362(h). This court does not express any opinion as to whether a *corporation* may be considered an "individual" for the purposes of section 362(h). The latter issue is not before this court.

**25.** Use of a more expansive definition of "individual" is consistent with the approach suggested by a leading commentator. *See 2 Collier on Bankruptcy* ¶ 362.12, at 362–86 (L. King 15th ed. 1990).

## VII. Recusal

██ Finally, FNB–Harvey argues that the bankruptcy judge should have *sua sponte* recused himself because he conducted an extrajudicial hearing in June 1991 to determine why the confirmed reorganization plan failed. The bank initially contends in this regard that the bankruptcy judge's request of the Trustee to investigate the cause of the plan's failure was not authorized by the Code and, as a consequence, the "judge became the case's administrator." The bank further contends that at the June 1991 hearing, the judge formed and expressed a personal opinion as to the cause of the plan's demise based upon inadmissible evidence presented at the hearing; to wit, the judge commented, "[w]hen you're in the overdrafts and can't get out of it, I suppose this [the plan's failure] was the inevitable result. Okay." Having allegedly formed this prejudicial opinion prior to trial, FNB–Harvey argues that the judge was no longer objective and should have recused himself pursuant to Bankruptcy Rule 5004 and 28 U.S.C. sections 455(a) and (b).[26]

██ FNB–Harvey's recusal argument is untimely. It is well-established that a party seeking disqualification "must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification." *Travelers Ins. Co. v. Liljeberg Enter., Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994); *United States v. Patrick*, 542 F.2d 381, 390 (7th Cir.1976), *cert. denied* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977); *but see SCA Serv., Inc. v. Morgan*, 557 F.2d 110, 117 (7th Cir.1977) (per curiam) (where the court held that a motion for recusal was not subject to a time limitation).[27] The purpose of the court imposed timeliness requirement is to foreclose a litigant from purposely waiting to learn whether the judge has ruled in its favor on the merits of the case before seeking disqualification as a means to defeat an unfavorable ruling. *See Travelers Ins. Co.*, 38 F.3d at 1411 (citation omitted); *see also Schurz Communications, Inc. v. F.C.C.*, 982 F.2d 1057, 1060 (7th Cir.1992) (Posner, J.). Where such a motion is not timely raised, it is waived. *See Travelers Ins. Co.*, 38 F.3d at 1410, 1411; *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse–Wisconsin, Inc.*, 991 F.2d 1249, 1254 (7th Cir.1993) (a party moving for disqualification under section 455(a) must immediately move for a writ of mandamus if the judge denies the motion; if mandamus is not sought, the issue is waived). Moreover, the judge presiding over the case must be afforded the opportunity to consider the issue and decide whether recusal is appropriate. *See United States v. Balistrieri*, 779 F.2d 1191, 1203 (7th Cir.1985) ("[s]ection 455 clearly contemplates that decisions with respect to disqualification should be made by the judge sitting in the case, and not by another

**26.** Bankruptcy Rule 5004(a) provides:
Disqualification of Judge. A bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstance arises or, if appropriate, shall be disqualified from presiding over the case.
Similarly, section 455 provides in pertinent part:
(a) Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
(b) He shall also disqualify himself in the following circumstances:
(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings.
*28 U.S.C. §§ 455(a), (b)(1).*

**27.** The *SCA Services* decision has been repeatedly criticized. *See United States v. Murphy*, 768 F.2d 1518, 1539 (7th Cir.1985), *cert. denied* 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986); *Union Carbide Corp. v. U.S. Cutting Serv., Inc.*, 782 F.2d 710, 716–17 (7th Cir.1986); *Delesdernier v. Porterie*, 666 F.2d 116, 120–23 (5th Cir.), *cert. denied* 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982) (where the court rejected the decision in SCA Services on its merits); *see also Schurz Communications, Inc. v. F.C.C.*, 982 F.2d 1057, 1060 (7th Cir.1992) (Posner, J.) (characterizing *SCA Services* as "weak precedent" since it did not cite *United States v. Patrick*, "which had established the law of this circuit on the question").

FNB–Harvey legitimately questions the binding authority of the *Schurz* decision issued by Judge Posner "in chambers" rather than by a full panel of the Seventh Circuit. This court, however, does not cite the holding of *Schurz* as established law of this circuit; rather, I cite it because Judge Posner's reasoning is correct, albeit persuasive authority only.

judge"), *cert. denied* 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986); *accord Bernard v. Coyne (In re Bernard),* 31 F.3d 842 (9th Cir.1994), cert. denied —— U.S. ——, 115 S.Ct. 1695, 131 L.Ed.2d 559 (1995).

■ In this case, FNB–Harvey first raised the issue of recusal on appeal. Despite the opportunity to raise this issue at trial, FNB–Harvey did not raise it before the bankruptcy judge, and cannot now pursue this argument in this forum as a means to defeat an unfavorable result. In any event, this court concludes that the bankruptcy court judge did not act improperly in convening the hearing on the cause of the reorganization plan's unexpectedly sudden failure. Moreover, he did not have "personal knowledge" of disputed evidentiary facts under section 445(b) since " 'personal' knowledge of evidentiary facts means 'extrajudicial.' " *Lac du Flambeau,* 991 F.2d at 1255. "Facts learned by a judge in his or her judicial capacity regarding the parties before the court, whether learned in the same or a related proceeding, cannot be the basis for disqualification." *Id.* (*citing Patrick,* 542 F.2d at 390). Accordingly, there was no basis for recusal.

### VIII. Conclusion

For the reasons previously set forth, this court remands this action to the bankruptcy court so that it may determine, using the reasonable expectations test, which of the post-petition overdraft credits were extended within the ordinary course of business under section 364(a). Notwithstanding this remand, the bankruptcy court's judgment entered in favor of the Trustee and against FNB–Harvey is modified to provide that the Trustee shall recover from FNB–Harvey the sum of $2,315,901.22 plus costs *and attorneys fees.* The bankruptcy court shall also determine on remand the specific amounts of recoverable fees and costs. The bankruptcy court's decision is otherwise affirmed, except with respect to its application of the "horizontal dimensions test" to determine whether the post-petition overdraft credits were extended within the ordinary course of business.

WHEREFORE, for the foregoing reasons, the decision of the bankruptcy court is affirmed in part and reversed in part, and the cause of action is remanded to the bankruptcy court for further proceedings consistent with this opinion.