In re John HONEYCUTT and Jennie Honeycutt.

John HONEYCUTT and Jennie Honeycutt, Plaintiffs,

v.

Jerry RICKMAN and Lois Rickman, Defendants.

Bankruptcy No. 94–10110 S.
Adv. No. 94–1046.

United States Bankruptcy Court,
E.D. Arkansas,
Batesville Division.

April 9, 1996.

---

Jeffrey Hance, Batesville, AR, for plaintiffs/debtors.

Howard Martin, Cabot, AR, for defendants.

Danny L. Schieffler, Chapter 7 Trustee, Helena, AR.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARY D. SCOTT, Bankruptcy Judge.

THIS CAUSE is before the Court upon the complaint filed by the debtors for wilful violation of the automatic stay, conversion and interference with a contractual relationship.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), 1334. Moreover, this Court concludes that these are "core proceedings" within the meaning of 28 U.S.C. § 157(b) as exemplified by 28 U.S.C. § 157(b)(2)(G), (L).

In October 1993, the debtors purchased a recreational boat dock and rights to camping grounds from Jerry and Lois Rickman. Adjacent to the dock itself, on leased property, are spaces for overnight campers and an additional eight lots leased to annual rent-

ers.[1] The electric power source for the dock and the camp spaces for the annual renters originated from a single power source. The annual renters use this power source and are billed for their percentage of the power.

The land on which the business operation is situated is owned by Ruby and Simon Moye. The Moyes had previously leased the land to the Rickmans for $2,400 per year. Although the Honeycutts are unclear on the matter, it appears from the testimony that the Rickmans and the Honeycutts were to enter into a sublease.[2] The sublease was not entered into at the time of the purchase transaction, however, because there was a shortage on the payment. Rickman refused to sign the lease at that time. Later, when Rickman presented a sublease to Honeycutt, Honeycutt refused to sign because it did not comport with his understanding of the agreement and because he had learned that the Moyes were unaware of the proposed sublease. It appears that Rickman had not only failed to advise Mrs. Moyes[3] of the dock purchase, but represented to her that the Honeycutts were merely relatives who would soon be leaving.

Rickman represented to the Honeycutts that the lessors had no objection to the arrangement. Moreover, Mr. Rickman was apparently not satisfied with his proposed arrangement, and, on February 1994, when the rent was due, without advising the Honeycutts, he made a payment of the full yearly rent, $2,400.

Although Rickman represented that there would be no difficulty with the lease or sublease, he failed, despite repeated requests, to give Honeycutt the Moyes' address and phone number. Finally, Honeycutt was able to obtain Mrs. Moyes telephone number through another person. When the Honeycutts visited Mrs. Moyes, they were rebuffed. As far as she was concerned, she had a lease with Rickman and would not consent to any sublease. Any dispute over the land was between the Rickmans and the Honeycutts. She had no interest in the dispute.

The total price of Dripping Springs Trout Dock, including motors, boats, a mobile home, and boating accessories, was $76,000. The debtors paid $21,000 in cash and signed a promissory note for $57,000. Under the bill of sale, the Rickmans sold "all other miscellaneous equipment used in the operation of a Trout Dock business known as Dripping Springs Trout Dock." A list of all of the property was prepared by Lois Rickman, and a review of the list and all of the items on it was conducted by Lois Rickman and Jenny Honeycutt. Later, the Rickmans removed the following items from the dock:

| Item | Value |
|---|---|
| Shopheater located in the shop: | $200 |
| Ladder | 60 |
| Riding lawn mower | 800 |
| Weedeater | 100 |
| TV antenna | 100 |
| TV booster | 50 |
| 3 cedar posts | 15 |
| Air compressor | 100 |
| 3 50–gallon trash barrels | 30 |

These items were taken without the Honeycutt's permission.[4]

After purchasing the boat dock, the Honeycutts moved into the trailer and began operating the dock, together with the bait shop and campgrounds. They removed trash from the area, cut firewood for the tempo-

1. Although written leases existed for the annual renters, the Rickmans did not deliver these to the Honeycutts. The Honeycutts had to get a copy from one of the renters.

2. The evidence is extremely unclear as to what occurred regarding the lease. Honeycutt's testimony regarding the lease does not comport with his testimony in prior hearings. Rickman's testimony is even more contradictory, telling different stories during his testimony at this trial. Finally, although the real estate agent who assisted in the transaction stated it was clear that a sublease was to be signed, the agent's demeanor during his testimony regarding the lease was markedly at odds with his demeanor during the rest of his testimony. Accordingly, the Court does not believe that the parties have truthfully presented the entire transaction or what occurred with regard to the lease.

3. By the time these transactions occurred, Mr. Moyes was either incapacitated or deceased. All dealings were with Mrs. Moyes.

4. The fact that Honeycutt chose not to cause a fight over the items does not amount to acquiescence or permission to remove the property.

rary campers, and performed all maintenance as needed. Their income from operations was derived from rentals to temporary campers, rental to some six "permanent" campers, boat rentals, and bait sales.

In the spring of 1994, the Honeycutts were severely injured in an automobile accident. While in the hospital, Mr. Honeycutt's parents operated the boat dock. However, Rickman, apparently unsatisfied with the manner in which the new owners were operating the premises, began meddling in the operations. While both Honeycutts were hospitalized, Rickman transferred the electricity to his name, and, for a period of time, locked off power to the boat dock, thereby interfering with its operations.

In May 1994, Rickman, purportedly to reimburse himself for the voluntary $2,400 rent payment he made to the Moyes on the leased land, demanded of the permanent campers that they pay their monthly rent and electricity fees directly to him. The permanent campers, most of them friends of the Rickmans for many years, complied. Inasmuch as Rickman was commandeering the rental payments, the Honeycutts deducted that amount from their monthly payments to the Rickmans on the promissory note. The Rickmans refused to accept the checks in the lesser amounts, thus refusing the payments under the mortgage. Not only did the Rickmans continue to pirate the rentals from the permanent campers, Rickman began to enter the campground on a fairly constant basis. In July and August 1994, he was there almost daily, causing confusion and hard feelings between the renters and the Honeycutts.

The Honeycutts filed a Chapter 13 petition-in-bankruptcy on July 25, 1994.[5] Even after the filing of the Chapter 13 petition, the Rickmans continued to collect from the annual renters. Indeed, although a restraining order was entered by this Court in September 1994, the Rickmans continued to accept

funds from the renters. For example, on October 17, 1994, the Rickmans sent a bill to one of the annual renters who remitted a check payable to "Dripping Springs Trout Dock." The Rickmans endorsed the check and retained the funds.

The Honeycutts assert three causes of action against the Rickmans, a violation of the automatic stay under section 362(h), conversion, and intentional interference with a business relationship. In addition, they request attorneys fees and punitive damages with regard to each cause.

### I. Removal of Inventory

■ The evidence does not support a violation of the stay or conversion with regard to the items Rickman removed from the property because the removal of property was not taken in violation of the Honeycutts' property or other rights. The removed items for which damages are sought were either not listed on the inventory of property to be transferred or were deleted from the list by Mrs. Honeycutt and Mrs. Rickman.

### II. Collection of Rents and Electricity Payments

■ Since the spring of 1994, the Rickmans collected monies from the annual renters to compensate themselves for their gratuitous payment of the underlying lease. Despite the filing of the Chapter 13 case on July 24, 1994, the Rickmans continued this pattern of self-help collection. Even after this Court issued an Order, on September 21, 1994, prohibiting them from collecting the rents, the Rickmans not only continued to collect funds, but even billed for them. They collected funds and, incredibly, endorsed a check payable to "Dripping Springs Trout Dock," the business owned by the Honeycutts.

### 1. Violation of the Automatic Stay

Section 362 of the Bankruptcy Code operates as a stay of:

5. On September 12, 1994, the Rickmans filed a Motion for Relief from Automatic Stay and Petition for Abandonment as well as an Objection to Confirmation of Plan. After hearing, held on September 27, 1994, the Court denied the motion and overruled the objection in part and sustained it in part, directing the debtors to

amend the plan to reflect a higher than proposed valuation of the property in which the Rickmans held a security interest. The amendments were made and a plan confirmed. However, in August 1995, the debtors converted their Chapter 13 case to a case under Chapter 7 of the Bankruptcy Code.

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(h) An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(a)(1), (3), 362(h).

■ In order for damages to be imposed, the Rickmans' violation of the stay must be "wilful," 11 U.S.C. § 362(h), *i.e.*, that he deliberately violated the stay, as opposed to taking accidental or inadvertent action. *See Hubbard v. Fleet Mortgage Co.*, 810 F.2d 778, 781 (8th Cir.1997). If deliberate action against the debtor or the estate was taken with knowledge of the stay, the violation of the automatic stay is wilful. *In re NWFX, Inc.*, 81 B.R. 500 (Bankr.W.D.Ark.1987). Further, a violation may be wilful even if the actor believes himself justified or if there was no specific intent to violate the stay. *In re Garofalo's Finer Foods, Inc.*, 164 B.R. 955 (Bankr.N.D.Ill.1994), *aff'd on stay issue and rev'd on other grounds*, 186 B.R. 414 (N.D.Ill. 1995).

Rickman does not deny he was aware of the bankruptcy case. Rather, in his testimony, Rickman asserts that he did not "collect" the rents, but was merely "receiving [them] by mail." Although he was represented by an attorney in this bankruptcy case, he complains that no one explained the stay to him. Inasmuch as *both* Rickmans deliberately collected the rents after the bankruptcy case was filed, and with knowledge of the bankruptcy case, their violation of the automatic stay was wilful. In any event, the Court does not believe the Rickmans' testimony. Rather, it appears that the Rickmans chose to ignore the automatic stay, as they chose to ignore the sale of the property and continue to operate the business.

■ The Rickmans' primary argument is that the parties entered into a modification of the contract. The Rickmans assert that the parties "met" on April 3, 1994, and agreed that the Rickmans could collect the rents and electricity from the annual renters. The Rickmans then sent a letter, dated April 6, 1994, in which they stated their terms and advised the Honeycutts that if they did not respond in three days, silence would be taken as assent. The Court does not believe, as a matter of fact, *see Linda Elenia Askew Trust v. Hopkins*, 688 S.W.2d 316 (Ark.App. 1985), (whether a contract was modified is a question of fact), that there was a valid oral or written modification of the contract giving the Rickmans the right to collect the rents.

■ First, there was no "meeting" of the parties, much less a meeting of the minds. The Rickmans, together with some of the annual renters, encountered and confronted the Honeycutts with demands. The Honeycutts, understandably taken aback, and not wanting to alienate the persons from whom they derived one-half of their livelihood, chose not to create a scene in front of the renters. The mere fact that they did not challenge the Rickmans does not sustain the Rickmans' burden of demonstrating that the Honeycutts' assented to any change in the contract. *Southern Acid & Sulphur Co., Inc. v. Childs*, 207 Ark. 1109, 184 S.W.2d 586 (Ark.1945); *Johnson v. Mosley*, 179 F.2d 573 (8th Cir.1950). Further, the letter of April 6, 1994, purportedly memorializing the "meeting" does not constitute a modification because there is no proof that the Honeycutts' assented to these terms. A modification of a contract, like the formation of the original terms, must meet all of the elements of a contract, including agreement by both parties. *Scottish Union and National Ins. Co. v. Wilson*, 183 Ark. 860, 39 S.W.2d 303 (Ark. 1931). Without the assent of the Honeycutts, the letter of April 6, 1994, did not give the Rickmans the right to seize the payments from the annual renters.

The evidence before the Court is that the Rickmans took unilateral actions which, ultimately, the Honeycutts resisted by deducting the amount seized from their monthly payments to the Rickmans. The Honeycutts were the persons, under the original contract, who had the right to collect the rents. By diverting the funds to themselves, the Rickmans converted property of the Honeycutts.

■ Second, the acts of April 3, and the letter of April 6, 1994, were not truly intended to constitute a modification of the contract, but, rather, a collection device imposed by the Rickmans. Upon notification of the bankruptcy case, they were obligated to cease collecting the rents in this manner. *In re Roberts,* 175 B.R. 339 (9th Cir. BAP 1994) (agency which received three post-petition payments pursuant to a pre-petition garnishment had an affirmative duty to stop the garnishment when notified of the automatic stay); *In re Raper,* 177 B.R. 107 (Bankr. N.D.Fla.1994) (credit union had an affirmative duty to discontinue payroll deductions once the Chapter 7 case was filed. A sincere belief that the debtor wished to continue the payroll deduction was insufficient to avoid damages); *Walker v. M & M Dodge, Inc.,* 180 B.R. 834 (Bankr.W.D.La.1995). The Rickmans failure to do so renders them liable for damages for violation of the automatic stay. *See In re Atkins,* 176 B.R. 998 (Bankr. D.Minn.1994).

Accordingly, the Rickmans are liable to the Honeycutts under section 362(h) for all funds collected from the annual renters from and after the date of the filing of the petition in bankruptcy on July 24, 1994, plus attorneys fees and costs.

## 2. *Conversion*

■ Conversion is the exercise of dominion over property in violation of the rights of the owner or person entitled to possession, *Quality Motors v. Hays,* 216 Ark. 264, 225 S.W.2d 326 (Ark.1949). Moreover, if bad faith exists, an enhanced value may be recovered. *Bradley Lumber Co. v. Hamilton,* 117 Ark. 127, 173 S.W. 848 (Ark.1915). The evidence before the Court, as discussed above, is that the Rickmans diverted the rent and electric utility monies owed to the Honeycutts. The Honeycutts were the persons, under the original contract, who had the right to collect the rents. By diverting the funds to themselves, the Rickmans converted property of the Honeycutts. Accordingly, the Rickmans are liable to the Honeycutts in conversion for all of the funds seized.

## 3. *Interference with Business Relations*

■ In order to recover under a theory of tortious interference with a business relationship, the Honeycutts must demonstrate the following:

(1) the existence of a valid contractual relationship or business expectancy;

(2) knowledge of the relationship or expectancy on the part of the interferer;

(3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and

(4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Mason v. Funderburk,* 247 Ark. 521, 446 S.W.2d 543, 547 (Ark.1969) (quoting *Calbom v. Knudtzon,* 65 Wash.2d 157, 396 P.2d 148 (1964)). Neither bad faith, *Conway Corp. v. Construction Engineers, Inc.,* 300 Ark. 225, 782 S.W.2d 36 (Ark.1989), *cert. denied,* 494 U.S. 1080 (1990) nor malice, *City National Bank of Fort Smith v. Unique Structures, Inc.,* 929 F.2d 1308 (8th Cir.1991), need be proven in order to recover under this tort. Indeed, a contractual relationship need not exist in order for this form of action to be maintained: it is sufficient to plead an "unjustified interference with a reasonable expectancy of commercial relations even where an existing contract is lacking." *Mason,* 446 S.W.2d at 547 (quoting *Downey v. United Weatherproofing, Inc.,* 363 Mo. 852, 253 S.W.2d 976 (1953)); *see Bishop v. Tice,* 622 F.2d 349, 358 (8th Cir.1980). Any manner of intentional invasion of interests is sufficient if not privileged. *Scholtes v. Signal Delivery Service, Inc.,* 548 F.Supp. 487 (W.D.Ark. 1982).

■ There is no question that the Honeycutts had a valid business expectancy by virtue of their purchase of the trout dock:

the Rickmans conveyed to them the right to collect the rents from the overnight and annual renters, which rents were a primary source of income to the business. Inasmuch as the Rickmans were the sellers and the prior operators of the dock and campgrounds, they were fully aware of the business relationship between the dock operators and the renters. Despite this knowledge, the Rickmans deliberately meddled in the business, diverted funds belonging to the Honeycutts, and assisted in causing the deterioration of the business relationship between Honeycutts and the renters. The Rickmans knew the importance of the funds to the operation of the business, yet deliberately acted to remove this source of income from the Honeycutts. Accordingly, they are liable to the Honeycutts for all of the funds diverted.[6]

### III. *Conclusion*

The Rickmans operated the Dripping Springs Trout Dock for approximately nine years. They had a clear understanding that the steady monies paid by the annual renters were crucial to the operation of the business. They also knew that the Honeycutts paid all of the electricity for the entire campground and were to be reimbursed by the annual renters based upon usage. By pirating the monies, they converted property and interfered in the business relationship of the Honeycutts with their renters. The Rickmans not only continued to collect the rent and utility monies after the filing of the bankruptcy, but also endorsed a check payable to the trout dock after a restraining Order was entered against them by this Court.

The uncontroverted evidence is that the Rickmans diverted $2,200 from the business by collecting funds from the annual renters. Accordingly, compensatory damages will be awarded in that amount. Not only are attorneys fees merited in this situation as a sanction, Section 362(h) mandates that such fees be reimbursed. *In re Garofalo's*, 186 B.R. 414, 427 (N.D.Ill.1995). Accordingly, the Honeycutts will be entitled to recover all of their attorneys fees associated with this adversary proceeding as well as all

other litigation relating to the Rickmans in this bankruptcy case. This will compensate the Honeycutts, not only for the litigation in this adversary proceeding, but also for the litigation necessary to obtain the temporary restraining order and otherwise deal with these bad faith creditors.

Although there is evidence of wilfulness or malice, *see Cassady v. United Insurance Company of America*, 370 F.Supp. 388 (W.D.Ark.1974), on the part of the Rickmans to merit punitive damages, there is little evidence they have any financial wealth or that the imposition of punitive damages would deter them or others from such behavior. *See Matthews v. Rodgers*, 279 Ark. 328, 651 S.W.2d 453 (Ark.1983). Moreover, the evidence indicates that the operation of the trout dock will *not* leave the Rickmans living in a luxurious manner. The Court believes that the imposition of attorneys fees and costs, in addition to the compensatory damages provides a sufficient deterrent. Accordingly, punitive damages will not be awarded.

**ORDERED:**

1. The Plaintiffs, John and Jenny Honeycutt, recover of the defendants Jerry and Lois Rickman the sum of $2,200 in compensatory damages.

2. The Plaintiffs John and Jenny Honeycutt recover of the defendants Jerry and Lois Rickman the sum of their attorneys fees and costs related to litigation with the Rickmans in this bankruptcy case and proceeding. Upon filing of an affidavit by counsel of such costs and fees, no later than twenty (20) days from entry of this Order, the Court shall enter judgment.

**IT IS SO ORDERED.**

---

**6.** There was insufficient evidence of other damages to support a further compensatory award.